**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| *In re* Application of<br><br>MOUSSY SALEM,<br><br>                            Applicant,<br><br>FOR AN ORDER TO TAKE DISCOVERY<br>PURSUANT TO 28 U.S.C. § 1782 FROM<br>JPMORGAN CHASE BANK, N.A. |

**Civil Action No.**

**MEMORANDUM OF LAW IN SUPPORT OF MOUSSY SALEM'S**
**APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

**BROWN RUDNICK, LLP**
7 Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Lauren Tabaksblat, Esq.
(Bar No. 4699351)
Tyler D. Purinton, Esq.
(Bar No. 5869664)
ltabaksblat@brownrudnick.com
tpurinton@brownrudnick.com

*Attorneys for Applicant Moussy Salem*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND .....................................................................................5

    A.  The Salem Family. ......................................................................................5

    B.  The African Businesses. ..............................................................................5

    C.  Management of the African Businesses. ......................................................7

    D.  The English Proceedings. ...........................................................................9

ARGUMENT ............................................................................................................11

I.   THIS APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF
     28 U.S.C. § 1782 ................................................................................................11

    A.  JPM Is Found In This District. .................................................................12

    B.  Moussy Salem Is An Interested Person. ...................................................12

    C.  The Discovery Sought Is "For Use" In The English Proceedings. ...........12

II.  THIS COURT SHOULD EXERCISE ITS DISCRETION TO GRANT THE
      APPLICATION ..................................................................................................14

    A.  JPM Is Not A Participant In The Foreign Proceedings. ...........................15

    B.  There Is No Evidence That The English Court Would Not Be Receptive To
        This Court's Assistance. ............................................................................15

    C.  This Application Does Not Implicate Any Foreign Proof-Gathering
        Restrictions. ..............................................................................................17

    D.  The Discovery Sought Is Not Unduly Burdensome. .................................18

CONCLUSION ........................................................................................................19

# TABLE OF AUTHORITES

**Cases**                                                                 **Page(s)**

*Application of Esses*,
    101 F.3d 873 (2d Cir. 1996) ............................................................................ 15

*Application of Malev Hungarian Airlines*,
    964 F.2d 97 (2d Cir. 1992) ...................................................................... 11, 18

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012) ......................................................... 11, 12, 13, 17

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017) .................................................................... 17, 18

*In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*,
    121 F.3d 77 (2d Cir. 1997) ............................................................................ 17

*In re Application of CBRE Glob. Invs. (NL) B.V.*,
    2021 WL 2894721 (S.D.N.Y. July 9, 2021) .............................................. 14, 19

*In re Application of Gorsoan Ltd. & Gazprombank OJSC*,
    2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014) ................................................ 16

*In re Application of Libyan Asset Recovery and Mgmt. Off.*,
    2023 WL 8445811 (S.D.N.Y. Nov. 16, 2023) ............................................... 12

*In re Application of Patokh Chodiev*,
    2021 WL 3270042 (S.D.N.Y. July 30, 2021) ................................................ 16

*In re Caterpillar Crédito, Sociedad Anónima de Capital Variable, Sociedad Financiera de Objecto Multiple, Entidad Regulada*,
    2023 WL 6317913 (D. Del. Sept. 28, 2023) ................................................. 15

*In re Imanagement Servs., Ltd.*,
    2005 WL 1959702 (E.D.N.Y. Aug. 16, 2005) ............................................. 16

*In re Iraq Telecom Ltd.*,
    2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019) .............................................. 15

*In re Niedbaski*,
    2023 WL 5016458 (S.D.N.Y. May 8, 2023) .......................................... 15, 17

*In re O'Keeffe*,
    650 F. App'x 83 (2d Cir. 2016) ......................................................... 15, 17

*In re Telegraph Media Grp. Ltd.*,
   2023 WL 5770115 (S.D.N.Y. Sept. 6, 2023) ..................................................... 16, 17

*In re Vale S.A.*,
   2020 WL 4048669 (S.D.N.Y. July 20, 2020) .......................................................... 16

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ........................................................................................... passim

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ............................................................... 12, 15, 17, 18

**Statutes**

28 U.S.C. § 1782 ...................................................................................................... 1, 12

Moussy Salem ("Moussy" or "Applicant"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his application (the "Application") for an order pursuant to 28 U.S.C. § 1782 authorizing him to seek discovery from JPMorgan Chase Bank, N.A. ("JPM" or "Respondent") in accordance with the form of subpoena *duces tecum* attached to the Application as **Exhibit A** (the "Subpoena").

## PRELIMINARY STATEMENT

This Application is in aid of a civil proceeding currently pending before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD), Claim No. BL-2022-000926 (the "English Proceedings"). In the English Proceedings, Moussy, on behalf of Monline International Limited ("Monline International"), asserts claims against one of Monline International's directors, Freddy Salem ("Freddy"), and Monline UK Limited ("Monline UK") and Monline UK's sole directors and shareholders, Salim Levy and Ezra Aghai (together, the "English Defendants").

The English Proceedings arise from the English Defendants' conspiracy to oust Moussy from the family businesses and misappropriate profits due to Moussy and his mother. The businesses at issue are a series of trading businesses, described herein as the African Businesses, that are owned by the Salem family, including Moussy, through a series of trusts. Until 2013, Moussy participated in the management of the African Businesses. In 2013, his uncles, Freddy and Beno Salem, and Freddy's son Philip, ousted Mousy from the management of the businesses. Since that time, Moussy has been denied access to documents and other critical information concerning the affairs and revenues of the African Businesses.

Moussy holds a 50% interest in Monline International. As of March 30, 2016, Monline International's core asset was a logistics agreement with Morsgate International Limited

("Morsgate"), pursuant to which Monline International provided logistics and management services (the "Parker Services") to the African Businesses.  In return, Monline International received fees from Morsgate based on a percentage of the expenditures incurred to provide those services.  Historically, Morsgate has served as the *de facto* treasury company for the African Businesses.

As treasurer for the African Businesses, Morsgate formed part of a corporate structure by which profits earned by certain African Businesses were transferred up to the Salem family trusts as the ultimate beneficiaries.  Specifically, profits generated by the African Businesses were paid to and held by Morsgate, which then transferred the money to upstream companies, primarily Glynfield Finance Limited ("Glynfield") and Transglobe Logistics Limited ("Transglobe"), which then made payments to the trusts.  The payments made by Morsgate to Glynfield/Transglobe therefore reflect the activity and profitability of the underlying African Businesses.  The extent of the African Businesses' operations, in turn, informed the value of the Parker Services because the fees earned by Monline International were based on the scope of Parker Services needed and provided to support those operations.

On or around June 7, 2016, Freddy transferred Monline International's assets—including the logistics agreement with Morsgate—to a new company, Monline UK, which is owned and directed by Defendants Levy and Aghai.  Neither Moussy nor his mother hold any interest in Monline UK.  The transfer was made without Moussy's knowledge and without consideration. Following the transfer, Monline UK became responsible for providing the Parker Services to the African Businesses, and in turn, collected the substantial fees from Morsgate generated therefrom.

Defendants Levy and Aghai have recently admitted in the English Proceedings that in or around July 2017, Monline UK ceased providing Parker Services to Morsgate. Instead, Monline UK began providing Parker Services to another newly formed company called Gestcom International Trading Offshore SAL/Gee Trading (Offshore) SAL ("Gestcom Trading"). This continued until around March 2021, when Monline UK ceased providing Parker Services altogether. Based on these admissions, Gestcom Trading effectively replaced Morsgate as the treasury company for the African Businesses—including with respect to the receipt of Parker Services until at least March 2021—and Gestcom Trading or other unknown third parties may currently still be providing Parker Services to other unknown third parties.

The chain of events concerning the provision and receipt of Parker Services and the revenues generated therefrom following the asset transfer from Monline International to Monline UK and thereafter is a critical issue in the English Proceedings. Pursuant to the logistics agreement, the revenues earned from the provision of Parker Services are calculated based on the cost incurred to provide those services, which, in turn, is contingent on the scope of the African Businesses' operations and expenditures. Therefore, to quantify the value of the Parker Services, the English Court will need to determine the operations and expenditures of the African Businesses. The court will also need to know the extent of any payments made by Morsgate, Gestcom Trading, and/or other unknown recipients of Parker Services to Monline UK and/or any unknown providers of Parker Services, which bears directly on the value of those services.

Respondent JPM has served as the U.S. intermediary bank for payments made by Morsgate to Transglobe and Glynfield. By way of example, between July 30, 2010 and August 2, 2010, JPM processed transfers from Morsgate to Transglobe and Glynfield totaling approximately $1.7 million. JPM, therefore, possesses documents concerning the profits earned

by the African Businesses and transferred through the Morsgate-Transglobe/Glynfield pipeline. Such information is highly relevant to ascertaining the profits of the African Businesses' operations, which informs the value of the Parker Services. Given the English Defendants' use of JPM for these Morsgate transfers, Moussy also seeks to ascertain whether Defendants utilized JPM to process payments from Morsgate (and potentially its successor, Gestcom Trading) to Monline UK and/or other unknown parties in connection with the provision and receipt of Parker Services. The existence or absence of such transfers after July 2021 is relevant to whether Parker Services are provided today, and if so, by which entity. Finally, to the extent the African Businesses maintain bank accounts at JPM, the account statements would provide critical, direct evidence of their operations and the value of the Parker Services.

        As further detailed below, this Application meets all of the statutory requirements of Section 1782. JPM is "found" in this District because it maintains an address in Manhattan. The discovery sought is highly material and relevant to the issues in the English Proceedings, and is "for use" in those proceedings. The documents and information requested will assist Moussy in establishing the fraud and breaches of duties by Freddy, and will provide critical information to calculate the equitable compensation and/or damages for the assets transferred out of Monline International.

        Moreover, each of the *Intel* discretionary factors are met. JPM is a nonparticipant in the English Proceedings and cannot be compelled by the English court to disclose information or documents, nor is the Subpoena an attempt to circumvent English proof-gathering restrictions. Finally, the Subpoena is narrowly tailored to documents and information concerning the main issues in the English Proceedings, including the provision and receipt of Parker Services, the revenues derived therefrom, and the fraud perpetrated by Freddy.

For these reasons and those detailed below, Moussy respectfully requests that the Court grant the Application and permit Moussy to serve the Subpoena on JPM.

## FACTUAL BACKGROUND

### A.      The Salem Family.

Moussy is a member of the Salem family.  The Salem family is composed of the children of Moussa Salem (Moussy's grandfather) and Perla Ishak Yael, and their descendants.  It is composed of four branches corresponding to Moussa's and Perla's four children: (i) the late Raymond Salem, husband to Mireille Salem and father to Moussy (the "R Branch"); (ii) Beno Salem and his family (the "B Branch"); (iii) Freddy Salem and his family (the "F Branch"); and (iv) Isaac Salem and his family (the "I Branch").  The four branches each hold or held interest in various trusts established by Moussa and Perla.  Declaration of Simon Goldring ("Goldring Decl.") (attached as Exhibit 1 to the Declaration of Lauren Tabaksblat), Ex. C, ¶ 4.

The I Branch's interests in these trusts have already been separated from those of the rest of the Salem family; the R, F, and B Branches, however, remain connected because they are all beneficiaries of certain trusts (which hold some parts of the African Businesses) and because they are beneficiaries of separate trusts which share interests in the same assets (again parts of the African Businesses).  *See id.*  At present, there has been a near total breakdown in relations between the R Branch (Moussy's branch) and the F and B Branches.

### B.      The African Businesses.

The Salem family operates a trading business in West Africa, known as the African Businesses, which are beneficially owned in equal parts by the R, F, and B Branches.  *See* Goldring Decl., Ex. C, ¶¶ 4-5.  The African Businesses' operations include the import and

distribution of consumer products such as pharmaceuticals, tobacco products, personal care, food, alcoholic and non-alcoholic beverages, and confectionary products. *See id.* ¶ 5(c).

Historically, the R, F, and B Branches managed the African Businesses equally. *See id.* ¶ 4. Moussy took over the R Branch's management duties in 1997 upon his father's incapacity due to a stroke. *See id.* ¶ 4(d). In 2013, however, Moussy was excluded from managing the African Businesses, which since then have been under the control of Freddy, Beno, and Freddy's son, Philip. *See id.* ¶ 4(f)-(g). Accordingly, from 2013 onward, Moussy has been denied access to the email systems and physical offices used to run the African Businesses, namely those systems owned and offices used by Parker Logistics Limited ("Parker Logistics") to provide Parker Services until 2016, and thereafter by Monline International, Monline UK, and any unknown third parties that may be currently providing Parker Services. *See* Goldring Decl. ¶ 8. As a result, since 2013, Moussy and other members of the R Branch have had very limited information concerning the operation of the African Businesses, including the provision of Parker Services, though they have remained entitled, as beneficiaries of various Salem family trusts, to their share of profits from the African Businesses.

As alleged in the English Proceedings, the Salem family trusts receive profits from the African Businesses through a corporate structure involving several offshore companies, including Morsgate. Goldring Decl., Ex. C, ¶ 3. Once the R Branch was excluded from management of the African Businesses, however, the profits from the African Businesses paid out to the R Branch through the trusts suffered a sudden and inexplicable decline. *See id.* ¶¶ 3(d), 4(g). Moussy alleges in the English Proceedings that Beno, Freddy, and Philip, who continue to manage the trading companies overseeing the African Businesses, have altered the

management of the African Businesses in order to divert profits away from Moussy and the R Branch.  *See id.* ¶ 4(f)-(g); *see also* Goldring Decl., Ex. A, ¶ 25.

## C.     Management of the African Businesses.

Historically, one of the primary ways that the Salem family operated the African Businesses was through an English company called Parker Logistics, which had a logistics agreement with Morsgate (the "Morsgate Agreement").  *See* Goldring Decl., Ex. A, ¶ 15. Morsgate operated as a treasury company for various companies within the African Businesses and formed part of a corporate structure by which profits earned by trading companies operating in West Africa were transferred up to the Salem family trusts as the ultimate beneficiaries.  *See* Goldring Decl., Ex. C., ¶¶ 3(d), 5(d).  Specifically, revenues generated by the trading companies were paid to and held by Morsgate, which then transferred the money to upstream companies (primarily Glynfield and Transglobe), which then made payments to the trusts.  *See id.*  Thus, the money flow from the African Businesses, to Morsgate, to Glynfield/Transglobe, to the trusts operated as a conduit for sending profits from the African Businesses to the Salem family.

The Salem family utilized Respondent JPM as an intermediary bank to effectuate these cross-country transfers.  For example, documents acquired by Moussy before he was ousted from the African Businesses show that on July 30, 2010, JPM processed transfers totaling approximately $473,000 USD from Morsgate to Transglobe.  Declaration of Lauren Tabaksblat ("Tabaksblat Decl.") ¶ 6 & Ex. 2 (swift messages reflecting transfers).  Additionally, on August 2, 2010, JPM processed additional transfers totaling approximately $1.2 million USD from Morsgate to Transglobe and Glynfield.  *Id.*  Such transfers represent profits made by the African Businesses that were sent through Morsgate and, ultimately, to the Salem family trusts.

Pursuant to the Morsgate Agreement, Parker Logistics provided logistical and management services to the African Businesses through Morsgate, including distribution, banking, IT, training, management and oversight of employees, recruitment, interfacing with suppliers, shipping, transportation and forwarding, warehousing, and purchasing—*i.e.*, the Parker Services. *See* Goldring Decl., Ex. C, ¶ 3(c); *see also* Goldring Decl., Ex. A, ¶ 15(c). In return, Parker Logistics received service fees that were calculated based on a percentage of the costs incurred to provide those services and support the African Businesses' operations. *See* Goldring Decl. ¶ 12; Goldring Decl., Ex. B, ¶ 9.

In March 2016, the B and F Branches transferred management of the African Businesses, including the right to provide Parker Services to these businesses via Morsgate, from Parker Logistics to Monline International. *See* Goldring Decl., Ex. A, ¶ 16(b). Monline International was incorporated in the British Virgin Islands on September 23, 2005. *Id.* ¶ 2. At all material times, Freddy owned 50% of Monline International, and Moussy and his mother beneficially owned the remaining 50%. *Id.* ¶ 5. Monline International was effectively dormant until it took over the provision of Parker Services from Parker Logistics in March 2016. *See id.* ¶ 6. Moussy loaned Monline International funds to finance the transfer of the Parker assets (including the Morsgate Agreement) to Monline International. *See* Goldring Decl., Ex. B, ¶ 11.

Shortly thereafter, a representative of Freddy requested that Moussy agree to a further transfer of management, this time from Monline International to a newly formed English company. *See* Goldring Decl., Ex. A, ¶ 19(a). Moussy did not object, on the condition that the ownership structure remained the same and that he and Freddy were both appointed directors of the new company. *Id.* ¶ 19(b). Instead, on or about June 7, 2016, Freddy—without disclosure to Moussy—transferred the assets of Monline International (including the right to provide Parker

Services) to Monline UK, in which neither Moussy nor his mother had any ownership interest or control, and for no or insufficient consideration. *Id.* ¶¶ 18-19. Thus, beginning in June 2016, Monline UK became the sole provider of Parker Services.

On July 11, 2023, after the English Proceedings had commenced, Monline UK, Salim Levy, and Ezra Aghai admitted that Monline UK had ceased providing Parker Services to Morsgate in or around July 2017. Instead, at that point, Monline UK began providing Parker Services to a newly formed Lebanese company called Gestcom Trading. Goldring Decl. ¶¶ 10-11. On August 2, 2023, the English Defendants further admitted that in or around March 2021, Monline UK ceased providing Parker Services entirely. *Id.* ¶ 11. Thus, from July 2017, Gestcom Trading took over Morsgate's role as treasurer in the African Businesses, including with respect to the receipt of Parker Services and the management of those businesses. Gestcom Trading or other unknown third parties may currently be providing Parker Services to other unknown third parties. *Id.* ¶¶ 10-11. The provision of Parker Services after July 2017 remains an ongoing line of inquiry in the English Proceedings. *Id.* ¶ 11.

**D.      The English Proceedings.**

On October 12, 2020, a British Virgin Islands court ordered Monline International to be wound up. *See* Goldring Decl., Ex. A, ¶ 3. The court appointed two liquidators who conducted an investigation into Monline International's affairs and determined it was necessary to initiate a separate litigation in the UK against Freddy, Monline UK, and the two directors and shareholders of Monline UK (Levy and Aghai). *See id.* ¶ 8. This resulted in the commencement of the English Proceedings, and on October 4, 2022, an English court assigned the prosecution of the case to Moussy pursuant to a deed of assignment between Monline International and Moussy. *See id.* ¶ 1.

The English Proceedings involve three core claims: (i) breach of duty by Freddy; (ii) gratuitous transfer by Freddy (and knowing receipt of that transfer by Monline UK, Levy, and Aghai); and (iii) conspiracy to divest Monline International of its assets to place those assets out of Moussy's reach. *See* Goldring Decl., Ex. A.

JPM, as the intermediary bank that facilitated transfers from Morsgate, possesses information concerning payments made by Morsgate to Monline UK and/or other unknown third parties in connection with the provision and receipt of Parker Services, as well as information concerning whether such payments continue today. Moussy also seeks to determine whether JPM has documents evidencing payments for Parker Services from Gestcom Trading, which took over Morsgate's role as treasurer of the African Businesses in July 2017. This will assist the English court to understand how Defendants perpetrated their scheme to divert, and the damages Monline International suffered as a result.

The English court will also need to assess what revenue and profits Monline International would have made but for the unlawful diversion of business to Monline UK and beyond. To do so, the court will need to understand the operations and expenditures of the African Businesses, as Monline International's revenues and profits would have derived from the services needed and provided to support those operations and expenditures. JPM possesses information concerning the activities and expenditures of the African Businesses, including payments from Morsgate, and subsequently Gestcom Trading, to Transglobe and Glynfield. Moussy also seeks to determine whether JPM has documents evidencing transfers to or from the African Businesses directly, as well as account statements for the businesses themselves.

On July 19, 2023, the English court ordered the parties to disclose documents relevant to, among others, the following issues: (i) the control of Monline UK; (ii) whether and under what

circumstances Monline UK ceased to provide Parker Services to Morsgate; (iii) whether Monline UK provided Parker Services or other services to any entity other than Morsgate (including without limitation Gestcom Trading); and (iv) the payments Monline UK has received from Morsgate or others and the disposition of those payments.  *See* Goldring Decl. ¶ 14.  Moreover, the provision of Parker Services from July 2017 onwards is an ongoing line of investigation in the English Proceedings, and the English court will need to understand (i) whether Parker Services were still required after March 2021, and (ii) who, if anyone, provided Parker Services after March 2021.  Although JPM is not a party to the English Proceedings and therefore not subject to the disclosure order, it possesses documents and information highly relevant to these issues.

## ARGUMENT

### I.  THIS APPLICATION SATISFIES THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782.

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  The statute was designed to "bring[] the United States to the forefront of nations adjusting their procedures to those of sister nations and thereby provid[e] equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects."  *Application of Malev Hungarian Airlines*, 964 F.2d 97, 99-100 (2d Cir. 1992).  In pursuit of these goals, "the statute has, over the years, been given increasingly broad applicability."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

Courts may grant a Section 1782 application where the following three statutory factors are met: (i) the discovery target resides or "is found" in the district where the application is

made; (ii) the application is made by an "interested person"; and (iii) the discovery is "for use in a foreign proceeding before a foreign tribunal." *Brandi-Dohrn*, 673 F.3d at 80; *see also* 28 U.S.C. § 1782.  As detailed below, Moussy satisfies each of the four statutory requirements.

### A.      JPM Is Found In This District.

The first statutory requirement—that the discovery target resides in the district of the court deciding the application—is satisfied because JPM maintains an address in Manhattan.  *See* Tabaksblat Decl., Ex. 3 (FDIC data showing JPM's Manhattan offices); *id.*, Ex. 2 (wire transfer confirmations from Morsgate to Transglobe and Glynfield listing JPM's address as "New York, NY"); *see also In re Application of Libyan Asset Recovery and Mgmt. Off.*, 2023 WL 8445811, at *9 (S.D.N.Y. Nov. 16, 2023) ("The Banks on which [applicant] seeks to serve subpoenas all maintain addresses within this District and may therefore be 'found' here.").

### B.      Moussy Salem Is An Interested Person.

Moussy Salem is an "interested person" under Section 1782.  The Supreme Court has held that an "interested person" includes a "complainant [who] 'possess[es] a reasonable interest in obtaining [judicial] assistance.'"  *Intel*, 542 U.S. at 256.  Moussy is the claimant in the English Proceedings, and by this Application seeks highly material and relevant evidence to support his claims in those proceedings.  He thus has a clear interest in obtaining judicial assistance to help him prosecute those claims and is an "interested person" for purposes of the statute.

### C.      The Discovery Sought Is "For Use" In The English Proceedings.

The information sought in the Subpoena is for use in an ongoing foreign proceeding.  The Second Circuit interprets "for use" to mean "something that will be employed with some advantage or serve some use in the proceeding—not necessarily something without which the applicant could not prevail." *Mees v. Buiter*, 793 F.3d 291, 298-301 (2d Cir. 2015) (holding

factor met where applicant sought discovery "to help her prove her claims").  A district court "should not consider the discoverability of the evidence in the foreign proceeding, [and] it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application."  *Brandi-Dohrn*, 673 F.3d at 82-84 (reversing denial of application because whether the evidence would be admissible in the foreign court is irrelevant); *see also Intel*, 542 U.S. at 260 ("Beyond shielding material safeguarded by an applicable privilege . . . nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there.").

Here, Moussy intends to use the discovery sought in the English Proceedings.  An order for disclosure has been given in those proceedings, and the information sought from JPM is consistent with the information that the Defendants are required to disclose.  For example, one of the issues in dispute is whether adequate consideration was paid for the transfer of the Morsgate Agreement from Monline International to Monline UK in June 2016.  The revenues generated by the provision of Parker Services is directly relevant to this determination.  As the intermediary bank for payments made by Morsgate—the original treasurer of the African Businesses and recipient of Parker Services—JPM possesses records relevant to the amounts paid for those services.  The same is true to the extent the English Defendants also used JPM to transfer payments from Gestcom, Morsgate's successor as of July 2017.  JPM is also likely to have highly relevant information regarding the expenditure and operations of the African Businesses, which, in turn, will inform the value of the Parker Services.  The requested discovery will therefore assist the English court in understanding the value of the Parker Services at the time of the transfer and what adequate consideration would have been for such services.  It will also

assist Moussy in his efforts to quantify the value of his claims, that is, the profits Monline

International would have generated from providing Parker Services but for the unlawful transfer.

Moreover, the continued changing hands of the provider of Parker Services is a

continuing line of investigation in the English Proceedings.  Information from JPM regarding

payments from Morsgate, and subsequently Gestcom Trading, for Parker Services from

June 2016 (the date of the asset transfer) onward will aid the English court in understanding what

entities provided Parker Services and whether those services were still required after

March 2021.

In sum, the requested discovery will aid the English court in understanding the full chain

of events surrounding the provision of Parker Services, the adequacy of the consideration paid

for the transfer from Monline International to Monline UK, and the extent of Moussy's damages.

## II.      THIS COURT SHOULD EXERCISE ITS DISCRETION TO GRANT THE APPLICATION.

Where, as here, Section 1782's statutory elements are satisfied, a district court may grant

discovery in its discretion.  *See Intel*, 542 U.S. at 264; *In re Application of CBRE Glob. Invs.*

*(NL) B.V.*, 2021 WL 2894721, at *3 (S.D.N.Y. July 9, 2021) ("The district court has broad

discretion whether to grant a section 1782 petition.").

The Supreme Court outlined four factors courts should consider when deciding whether

to exercise its discretion under Section 1782: (i) whether "the person from whom discovery is

sought is a participant in the foreign proceeding"; (ii) "the nature of the foreign tribunal, the

character of the proceedings underway abroad, and the receptivity of the foreign government or

the court or agency abroad to U.S. federal-court judicial assistance"; (iii) whether the request

"conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a

foreign country or the United States"; and (iv) whether the request is otherwise "unduly intrusive

or burdensome." *Intel*, 542 U.S. at 264-65; *see also Mees*, 793 F.3d at 298.  These factors all weigh in favor of granting the Application.

### A. JPM Is Not A Participant In The Foreign Proceedings.

"The Supreme Court has recognized that the need for U.S. court assistance is most apparent where the § 1782 respondent is not a party to the foreign action and not otherwise within the jurisdiction of the foreign court."  *In re Caterpillar Crédito, Sociedad Anónima de Capital Variable, Sociedad Financiera de Objecto Multiple, Entitad Regulada*, 2023 WL 6317913, at *3 (D. Del. Sept. 28, 2023) (finding first factor met because respondents were not parties to foreign proceeding).  For that reason, courts in this Circuit routinely grant discovery when the respondent is not a party to the foreign action.  *See, e.g.*, *In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) (allowing discovery from non-party); *In re Iraq Telecom Ltd.*, 2019 WL 3798059, at *4 (S.D.N.Y. Aug. 13, 2019), *reconsideration denied*, 2019 WL 5080007 (S.D.N.Y. Oct. 10, 2019) (same).

Here, JPM is not a party to the English Proceedings.  Accordingly, the first factor weighs strongly in favor of granting the Application.

### B. There Is No Evidence That The English Court Would Not Be Receptive To This Court's Assistance.

The second discretionary factor also weighs in favor of Moussy.  An applicant need not show an "overt expression from the foreign court that it wants or needs" the specific information sought under Section 1782.  *Mees*, 793 F.3d at 303-04; *see also In re Niedbaski*, 2023 WL 5016458, at *6 (S.D.N.Y. May 8, 2023) (same).  Rather, the party opposing discovery must present "authoritative proof" that the foreign tribunal would reject U.S.-court assistance, such as "explicit pronouncements . . . enjoining discovery in foreign jurisdictions."  *Application of Esses*, 101 F.3d 873, 876-77 (2d Cir. 1996) (affirming grant of application because respondent

"offer[ed] no such authoritative evidence that the Hong Kong court in which they are proceeding would reject the evidence [applicant] seeks."). If there are no explicit statements "in a forum country's judicial, executive, or legislative declarations that *specifically address the use of evidence gathered under foreign procedures*," the court's "ruling should be informed by section 1782's overarching interest in providing equitable and efficacious procedures for the benefit of tribunals and litigants involved in litigation with international aspects." *In re Imanagement Servs., Ltd.*, 2005 WL 1959702, at *3 (E.D.N.Y. Aug. 16, 2005) (emphasis in original). The "party opposing the Section 1782 application bears the burden of proving the non-receptivity of the foreign tribunal." *In re Application of Gorsoan Ltd. & Gazprombank OJSC*, 2014 WL 7232262, at *7 (S.D.N.Y. Dec. 10, 2014).

There is no evidence that the English court will not be receptive to accepting evidence obtained through Section 1782 discovery. In fact, as this Court has recognized, the English Civil Court of Appeal has previously "indicated it was amenable to good-faith Section 1782 discovery" and "found no reason to second-guess the Southern District of New York's application of the *Intel* factors." *In re Telegraph Media Grp. Ltd.*, 2023 WL 5770115, at *9 (S.D.N.Y. Sept. 6, 2023) (citing *Soriano v. Forensic News LLC*, Case No. CA-2023-000292). That is why this Court regularly finds English courts would be receptive to U.S. assistance. *See, e.g.*, *In re Application of Patokh Chodiev*, 2021 WL 3270042, at *2 (S.D.N.Y. July 30, 2021) ("[I]t appears that the United Kingdom courts would likely be receptive to the requests and that the evidence sought would presumably be admissible."); *In re Vale S.A.*, 2020 WL 4048669, at *4 (S.D.N.Y. July 20, 2020) ("[T]he High Court would be receptive to this Court's assistance and there is no evidence to the contrary."). Simply put, Respondent cannot meet its burden of

showing that the English court would be unreceptive to discovery obtained through this Application.  The second *Intel* factor therefore weighs in favor of granting discovery.

### C.     This Application Does Not Implicate Any Foreign Proof-Gathering Restrictions.

The third *Intel* factor requires this Court to consider "whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  Again, whether the discovery sought would be obtainable or admissible in the foreign proceeding has no bearing on this inquiry.  *See Brandi-Dohrn*, 673 F.3d at 82 ("[A] district court should not consider the discoverability of the evidence in the foreign proceeding, [and] it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application."); *O'Keeffe*, 650 F. App'x at 85 (Second Circuit law "expressly forbid[s] district courts from considering the discoverability of evidence in a foreign proceeding when ruling on a § 1782 application").  Likewise, a "district court may not refuse a request for discovery pursuant to § 1782 [just] because a foreign tribunal has not yet had the opportunity to consider the discovery request."  *In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997).  Nor is an applicant required to first exhaust all other discovery options in the foreign tribunal before seeking U.S.-court assistance.  *See Mees*, 793 F.3d at 303 (reversing holding that discovery would be proper "only if [applicant] had first tried and failed" in the foreign court).  Rather, in evaluating this factor, courts consider "whether the application is brought in good faith" or if there is "evidence of . . . chicanery."  *Telegraph Media*, 2023 WL 5770115, at *10; *see also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135-36 (2d Cir. 2017) (affirming application where no evidence of bad faith).  Again, "authoritative proof" of circumvention in required.  *Neidbalski*, 2023 WL 5016458, at *8.

Here, the Application does not implicate any foreign proof-gathering restrictions. Moussy has been unable to obtain information regarding the provision and receipt of Parker Services because he has been ousted from the African Businesses.  Moreover, the English court has not denied similar discovery; indeed, the scope of the discovery sought aligns with the topics of party disclosure already permitted by the English court, including with respect to Morsgate's, Gestcom Trading's, and other unknown third parties' receipt of Parker Services; the amounts paid for those services; and whether those services are provided today.  *See* Goldring Decl. ¶ 14. Thus, the English court has already acknowledged the need for this discovery.

### D.     The Discovery Sought Is Not Unduly Burdensome.

The fourth *Intel* factor assesses whether Moussy's request for discovery is "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 245.  It is not.  Courts applying Section 1782 do not limit discovery to the scope of discovery available in the foreign proceeding, as "[f]ew if any foreign jurisdictions permit the scope of discovery available in our courts."  *Mees*, 793 F.3d at 302.  Rather, courts should assess burden "by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."  *Id.* (rejecting district court's assessment of burden based on the scope of discovery in the Netherlands).  To the extent a court finds a discovery request overbroad, it should consider whether that defect can be cured through a more limited grant of discovery rather than denying the application outright.  *See Malev Hungarian*, 964 F.2d at 102 (noting that the district court may limit discovery to reduce burden); *Accent Delight*, 869 F.3d at 134 (same).

Here, the discovery Moussy seeks is not unduly burdensome.  Moussy seeks information regarding, *inter alia*, the provision and receipt of Parker Services, payments for and the value of those services, whether those services were still necessary and/or provided after March 2021, and

if so, who provided them.  This information is highly relevant to evaluating what should have constituted valuable consideration for the transfer of Parker Services to Monline UK, proving the damages Monline International suffered as a result of the transfer, and the English Defendants' conspiracy to divert and conceal monies to which Monline International is lawfully entitled.  The discovery sought is primarily account data, which should be readily available to JPM and relatively simple to collect and produce.  *See CBRE Glob.*, 2021 WL 2894721, at *11 (finding requests not unduly burdensome where discovery sought was "financial data, not records (like emails) as to which the collection process can be particularly burdensome").  Although Moussy does not believe these requests impose any undue burden, he will engage in a good faith effort to meet and confer over the parameters of Respondent's search to minimize any legitimate concerns.  Thus, the fourth *Intel* factor weighs in favor of granting Moussy's Application.

## CONCLUSION

For the foregoing reasons, Moussy respectfully requests that this Court grant his Application authorizing the issuance of the Subpoena to JPM in the form attached to the Application as **Exhibit A**, authorize Moussy to issue additional subpoenas for the production of documents and/or depositions of JPM's corporate representative as appropriate, and for such other and further relief as this Court deems just and proper.

Dated: January 3, 2024

Respectfully submitted,

**BROWN RUDNICK LLP**

By: _/s/ Lauren Tabaksblat_
    Lauren Tabaksblat
    (Bar No. 4699351)
    Tyler D. Purinton
    (Bar No. 5869664)

    7 Times Square
    New York, New York 10036
    Telephone: (212) 209-4800
    Facsimile: (212) 209-4801
    ltabaksblat@brownrudnick.com
    tpurinton@brownrudnick.com

*Counsel for Applicant Moussy Salem*