# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

*In re* Application of

MOUSSY SALEM,

                              Applicant,

FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782 FROM
JPMORGAN CHASE BANK, N.A.

Civil Action No.: 1:24-mc-00005-JPC

---

## APPLICANT MOUSSY SALEM'S OPPOSITION TO FREDDY SALEM'S MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER

**BROWN RUDNICK, LLP**
7 Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
Lauren Tabaksblat, Esq.
(Bar No. 4699351)
Tyler D. Purinton, Esq.
(Bar No. 5869664)
ltabaksblat@brownrudnick.com
tpurinton@brownrudnick.com

*Attorneys for Applicant Moussy Salem*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................5

I.   THE REQUESTED DISCOVERY IS "FOR USE" IN THE ENGLISH
     PROCEEDINGS. ....................................................................................................5

     A.   As This Court Properly Acknowledged, The "For Use" Requirement Is A
          Low Burden. ...............................................................................................5

     B.   The English Court Did Not Reject The Type Of Discovery Moussy Seeks
          Here. ............................................................................................................6

II.  MOUSSY'S APPLICATION SATISFIES THE *INTEL* DISCRETIONARY
     FACTORS. ..............................................................................................................13

     A.   Moussy's Application Does Not Implicate Foreign Proof-Gathering
          Restrictions. ................................................................................................13

     B.   Moussy's Requests Are Not Unduly Burdensome. ....................................17

III. MOUSSY HAS MET HIS RULE 45 OBLIGATIONS.........................................19

CONCLUSION .................................................................................................................20

# <u>TABLE OF AUTHORITES</u>

**Page(s)**

**Cases**

*Application of Esses*,
  101 F.3d 873 (2d Cir. 1996)...................................................................... 13

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012).......................................................................... 5

*Deposit Ins. Agency v. Leontiev*,
  2018 WL 3536083 (S.D.N.Y. July 23, 2018) ............................................ 6

*Gushlak v. Gushlak*,
  486 F. App'x 215 (2d Cir. 2012) .............................................................. 19

*In re Accent Delight Int'l Ltd.*,
  791 F. App'x 247 (2d Cir. 2019) ........................................................ 13, 16

*In re Al-Attabi*,
  2022 WL 229784 (S.D.N.Y. Jan. 26, 2022) ............................................. 16

*In re Chevron Corp.*,
  633 F.3d 153 (3d Cir. 2011)...................................................................... 15

*In re Harbour Victoria Inv. Holdings Ltd.*,
  2015 WL 4040420 (S.D.N.Y. June 29, 2015) .......................................... 18

*In re Hornbeam Corp.*,
  2015 WL 13647606 (S.D.N.Y. Sept. 17, 2015).......................................... 19

*In re Hornbeam Corp.*,
  722 F. App'x 7 (2d Cir. 2018) .................................................................. 19

*In re Kreke Immobilien KG*,
  2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013)............................................ 16

*In re Metallgesellschaft AG*,
  121 F.3d 77 (2d Cir. 1997)................................................................. 13, 14

*In re Microsoft Corp.*,
  428 F. Supp. 2d 188 (S.D.N.Y. 2006)....................................................... 16

*In re Nat'l Bank Tr.*,
  2023 WL 2386392 (D. Conn. Mar. 7, 2023) ............................................ 18

ii

*In re Niedbalski*,
    2023 WL 5016458 (S.D.N.Y. May 8, 2023) ............................................................. 13

*In re O'Keeffe*,
    650 F. App'x 83 (2d Cir. 2016) ......................................................................... 5, 14

*In re Okean B.V. & Logistic Sol. Int'l*,
    60 F. Supp. 3d 419 (S.D.N.Y. 2014) ...................................................................... 18

*In re Postalis*,
    2018 WL 6725406 (S.D.N.Y. Dec. 20, 2018) ......................................................... 13

*In re Refinería de Cartagena S.A.S.*,
    2024 WL 95056 (S.D.N.Y. Jan. 8, 2024) ......................................................... passim

*In re Reyes*,
    2019 WL 6170901 (S.D.N.Y. Nov. 20, 2019) ......................................................... 19

*In re Sveaas*,
    249 F.R.D. 96 (S.D.N.Y. 2008) ........................................................................ 6, 17

*In re Tel. Media Grp. Ltd.*,
    2023 WL 5770115 (S.D.N.Y. Sept. 6, 2023) ..................................................... 15, 16

*In re Top Matrix Holdings, Ltd.*,
    2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ........................................................... 15

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ........................................................................ 6, 13, 15, 17

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
    895 F.3d 238 (2d Cir. 2018) ............................................................................... 18

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ......................................................................... passim

Moussy Salem ("Moussy"), by and through his undersigned counsel, respectfully submits this Opposition to Intervenor Freddy Salem's ("Freddy") Motion to Quash Subpoena and For a Protective Order (Dkt. 19).  In support thereof, Moussy states as follows:

## PRELIMINARY STATEMENT

This Court previously granted Moussy's Application to obtain evidence from JPMorgan Chase Bank, N.A. ("JPM") in aid of a civil proceeding (the "English Proceedings") currently pending before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD) (the "English Court").  The English Proceedings arise from the misappropriation of Monline International's assets—primarily the right to provide logistical and management services ("Parker Services") to a group of businesses owned by the Salem family (the "African Businesses") pursuant to an agreement with Morsgate International Limited ("Morsgate Agreement")—by Moussy's uncle, Freddy Salem.  Monline International was to provide the Parker Services to the African Businesses in return for fees calculated based on the cost of services provided to the African Businesses.

In 2016, Freddy transferred the right to provide Parker Services to a new company, Monline UK, without Moussy's consent and without consideration.  Moussy does not hold any interest in Monline UK.  Following the transfer, Monline UK became responsible for providing the Parker Services, and in turn, collected the substantial fees generated therefrom.  In or around July 2017, Monline UK ceased providing Parker Services to Morsgate and instead began providing them to another newly formed company called Gestcom Trading.  This continued until around 2021, when Monline UK ceased providing Parker Services altogether.  The provision and receipt of Parker Services and the revenues generated therefrom following the asset transfer from Monline International to Monline UK, and thereafter, is the central issue in the English Proceedings.

On January 23, 2024, this Court granted Moussy's Application, finding that it satisfied the statutory requirements of 28 U.S.C. § 1782 and the discretionary factors set forth by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

Nevertheless, Freddy has now moved to quash the Subpoena and for a protective order, on the putative basis of a myriad of meritless arguments to prevent Moussy from lawfully obtaining evidence that will support his claims and undermine Freddy's defenses in the English Proceedings. As a preliminary matter, many of Freddy's objections are moot; as Freddy is well aware, JPM did not possess records responsive to Request Nos. 2 and 7-10, representing half of Moussy's Subpoena requests. With respect to the other five requests, although Freddy spills much ink characterizing the requests as an "extensive" dive into "records for ***seventy-nine*** different African Businesses and several other entities," the reality is that JPM produced only seven spreadsheets with limited (but highly relevant) information concerning payments between a narrow subset of those businesses—all of which have been shared with Freddy. The discovery requested and received is not the expansive fishing expedition Freddy would have this Court believe.

On the merits, Freddy contends that the Application does not meet the statutory "for use" requirement under Section 1782 because the English Court purportedly rejected Moussy's attempts to seek similar information in the English Proceedings. But even if that were true (it is not), Moussy's Application should still be affirmed. As the Supreme Court and courts in this Circuit have made abundantly clear, courts assessing the "for use" requirement under Section 1782 must disregard whether the discovery sought is discoverable or admissible in the foreign tribunal. Through his Motion, Freddy joins a long list of foreign litigants who have made the same arguments, and which have been uniformly rejected. As this Court correctly

acknowledged at the April 16, 2024 conference, the "for use" statutory requirement is "not a

particularly demanding burden."

In support of his position that the English Court rejected similar discovery in the English

Proceedings, Freddy points the Court to a cherry-picked section of the transcript from a

July 19, 2023 hearing in which the English Court declined to order categories of discovery that

Moussy does not request here.  In reality, immediately after the cherry-picked statement, the

English Court said:

> To put the Parker Services in context, I have considered that carefully and I have
> decided that the Parker services are sufficiently contextualized by [disclosure] issue
> 8(b), which is what services did Parker supply to Morsgate pursuant to the Parker
> Logistics agreement, and the remainder of the other issues in [disclosure issue] 8,
> including 8(g), which we kept in[.]

In ordering disclosure issue 8—which concerns the provision of Parker Services to "persons

other than Morsgate," payments made for those services, and the "terms" and "circumstances" of

those services—the Court made emphatically clear that he found the provision of Parker Services

to the African Businesses relevant to Moussy's claims:

> I can see very clearly how the size and scope of the business opportunity which you
> say has been transferred away from [Monline International] and then the claimant,
> and therefore the claimant's cause of action.  **I can see how the extent of that
> business opportunity – to assess the extent of that business opportunity, an
> analysis would need to be made about what Parker services were being
> supplied and to whom.  I can see how that is relevant to, to put it broadly,
> quantum.**

And if that wasn't enough, the English Court further expressly acknowledged the relevance of

"benefits that [Defendants] have received from the supply of Parker services under the 2016

agreement or otherwise to other companies within the African business or from other trading

activities of [Monline UK]."  Through his Application, Moussy seeks to do exactly what the

English Court endorsed—assess the extent of the business opportunity diverted from Monline

International to ascertain whether he was paid fair consideration and the quantum of his damages. Freddy's characterizations to the contrary are misleading and wrong.

Turning to *Intel*'s discretionary factors, Freddy argues that the English Court's purported rejection of Moussy's requests suggest that Moussy is covertly trying to circumvent English proof-gathering restrictions. Again, even had the English Court denied similar requests (it did not), that is not the law. Rather, this Court looks to whether the intervening defendant has met its burden of setting forth "authoritative proof" that Moussy is attempting to avoid "rules akin to privileges" that prohibit the acquisition or use of the requested discovery in the foreign tribunal. Freddy has not and cannot proffer such proof. Nor, despite what Freddy insists, does the circumvention factor turn on the discoverability or admissibility of the requested discovery in the foreign court. Finally, the Application seeks plainly relevant evidence and is not overbroad or unduly burdensome.

Freddy also asks this Court to quash the Subpoena and enter a protective order because Moussy did not provide Freddy notice until after he issued the Subpoena to JPM. Courts in this Circuit, however, "routinely" decline to quash subpoenas for lack of notice absent some showing of prejudice. In Section 1782 proceedings, where the foreign defendant is permitted to intervene and challenge an already-issued subpoena on its merits, and the court nevertheless affirms its prior decision to grant the application, there is no prejudice. The only prejudice Freddy asserts— that he has been "deprived" of "the benefit of the English Court's ruling"—is a non-starter given that there was no "ruling" in his favor that impacts Moussy's Application. In these circumstances, the only available remedy is for Moussy to provide Freddy with copies of the Subpoena and all materials produced by JPM in response—exactly as Moussy has already done here.

For these reasons and those set forth below, Moussy respectfully requests that the Court deny Freddy's Motion.

## ARGUMENT

I. **THE REQUESTED DISCOVERY IS "FOR USE" IN THE ENGLISH PROCEEDINGS.**

A. **As This Court Properly Acknowledged, The "For Use" Requirement Is A Low Burden.**

At the April 16, 2024, hearing, this Court properly recognized that "[t]he 'for use' statutory requirement is not a particularly demanding burden," and "the answer here [is] to allow the U.K. court to decide whether [the discovery] is relevant or not to that proceeding." (Dkt. 23, 4/16/24 Hearing Tr. 11:25-12:4.) This reasoning is consistent with Supreme Court and Circuit precedent which have categorically rejected Freddy's position that this Court should consider whether the English Court would allow or accept the requested discovery. It is well-settled that such an inquiry is completely irrelevant—and in fact, "forbid[den]"—when determining whether the discovery is "for use" in the foreign proceeding. *See Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012) ("[A] district court should not consider the discoverability of the evidence in the foreign proceeding, [and] it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application."); *In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) ("[O]ur precedents expressly forbid district courts from considering the discoverability of evidence in a foreign proceeding when ruling on a § 1782 application."); *Mees v. Buiter*, 793 F.3d 291, 303-04 (2d Cir. 2015) ("[T]he district court should not condition discovery on an overt expression from the foreign court that it wants or needs the information."); *In re Refinería de Cartagena S.A.S.*, 2024 WL 95056, at *7 (S.D.N.Y. Jan. 8, 2024) ("The term 'for use' is afforded a 'broad interpretation,' and the 'sought-after evidence need not be admissible or even discoverable under the rules of the foreign

jurisdiction.'") (quoting *Deposit Ins. Agency v. Leontiev*, 2018 WL 3536083, at *3 (S.D.N.Y. July 23, 2018)).  That is because, as the Supreme Court has made abundantly clear, "nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 260 (2004).

Freddy recycles the same arguments that have been made—and rejected every time—by foreign litigants who seek to suppress information they fear will be used against them.  These arguments fail in this case, too.

**B.    The English Court Did Not Reject The Type Of Discovery Moussy Seeks Here.**

As Moussy set forth in his Application, and as this Court found, the information Moussy requests through the Subpoena is "for use" in the English Proceedings and satisfies the requirements of Section 1782.  (Dkt. 2 at 12-14.)  The Second Circuit interprets "for use" to mean "something that will be employed with some advantage or serve some use in the proceeding—not necessarily something without which the applicant could not prevail." *Mees*, 793 F.3d at 298-301 (holding "for use" requirement met where applicant sought discovery "to help her prove her claims").  With respect to relevancy, because "[t]he burden imposed on the applicant [under the "for use" element] is *de minimis*," courts, at most, consider whether the requested information is "plainly irrelevant." *Refinería*, 2024 WL 95056, at *7; *see also In re Sveaas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) ("[B]ecause the Court is called upon only to resolve a discovery issue that arises from underlying litigation in foreign jurisdictions, the court should be particularly wary of denying discovery on relevance grounds.").

The Subpoena requests information that is highly relevant to the ongoing disputes in the English Proceedings and will help Moussy prove his claims.  By way of limited example, one of

the issues in dispute is whether Freddy paid adequate consideration for the transfer of the right to provide Parker Services from Monline International to Monline UK in 2016.  (*See* 5/1/24 Decl. of S. Goldring ¶¶ 3-5.)  The fees generated by the provision of Parker Services are directly relevant to this determination, as those fees would have been paid to Monline International but for the unlawful transfer; the expenditures and operations of the African Businesses, in turn, are highly relevant to the amount of those fees.  (*See id.* ¶ 6.)  The requested discovery will also assist Moussy in his efforts to quantify his damages.

Freddy contends that Moussy's position is "groundless" because Moussy purportedly "previously admitted" that "the fees paid for the Parker Services were not calculated based on the operations and expenditures of the African Businesses," but rather, "based on a percentage of the costs incurred [by Monline] to provide those services."  (Mot. at 7-8; *see also* Decl. of J. Michaelson ¶¶ 21-23 & Ex. D.)  Freddy misses the point.  The costs of providing Parker Services—i.e., logistical and management services—are necessarily tethered to the scope of the operations supported by those services.  (*See* Dkt. 3, Decl. of S. Goldring ¶ 12 (attached as Ex. 1 to Decl. of L. Tabaksblat); 5/1/24 Decl. of S. Goldring ¶ 6 (noting financial records showing significant trading activity by the African Businesses would, among other things, refute Defendants' defense that the transfer of the Parker Services did not represent the transfer of a valuable business), ¶ 8 (noting English Court's acknowledgment that "the extent of th[e] business opportunity" transferred away from Monline International "is relevant to . . . quantum").)  Indeed, Freddy misleadingly omits the rest of the sentence that he quotes from Moussy's brief.  (*See* Dkt. 2 at 8 ("In return, Parker Logistics [the predecessor provider of Parker Services] received service fees that were calculated based on a percentage of the costs incurred to provide those services **and support the African Businesses' operations**." (emphasis added));

*see also id.* at 2 ("The extent of the African Businesses' operations, in turn, informed the value of the Parker Services because the fees earned by Monline International were based on the scope of Parker Services needed and provided to support those operations.").)

Freddy concedes the relevance of Morsgate, Monline International, Monline UK, Gestcom Trading, and Parker Logistics Limited to the English Proceedings.  (*See* Mot. at 6-7 (noting "the activities of Monline International and Parker Logistics Limited are the subject of the English Case," and that Gestcom Trading, Monline UK, and Morsgate "have some connection to the English Case"); Decl. of J. Michaelson ¶ 15.)  His primary objection is that the Subpoena is improper because the English Court purportedly "denied Moussy's request for discovery into the operations of the African Businesses."  (Mot. at 6.)

To start, Freddy's position makes no sense considering that the Subpoena does not even request the categories of documents that the English Court declined to order.  (*See* 5/1/24 Decl. of S. Goldring ¶¶ 12-16.)  Freddy lists five categories of documents related to the African Businesses that were excluded from the so-ordered disclosures in the English Proceedings ("Disclosure Category No. 9"): (i) "What was the composition of the trading business in Africa associated with the Salem family (African Business) from 2013 onwards and how did it operate?"; (ii) "What role did Morsgate play in the African Business from 2013 onwards?"; (iii) "What role did Parker play in the African Business from 2013 until 30 March 2016?"; (iv) "What role did [Moussy], [Freddy], [Salim Levy] and [Ezra Aghai] play in the African Business, Morsgate, Parker and [Monline UK] from 2013 onwards?"; and (v) "What role did [Monline UK] play in the African Business from 7 June 2016?"  (Mot. at 2.)

The Subpoena, however, does not request discovery related to "the composition" of the African Businesses or "how . . . it operate[s]" (e.g., operating agreements or documents detailing

8

the various entities' corporate activities, interplay, or personnel), nor does it request the "role[s]" of the Defendants in the African Businesses. (*See* 5/1/24 Decl. of S. Goldring ¶ 16.) JPM, of course, does not possess such information. Rather, the Subpoena requests primarily financial records that will help Moussy show the value of the Parker Services and quantify his damages. (*See* Dkt. 1-1 at 11-12.) The Subpoena further requests documents "sufficient to show the identities of any individuals or entities" who control the accounts of, or who instructed payments from/to, Morsgate, Monline UK, and Gestcom Trading, entities which are all relevant to the provision and receipt of Parker Services and which Freddy admits are relevant to the English Proceedings. (*Id.* at 12.)[1]

Nevertheless, Freddy insists that the English Court categorically rejected all inquiries into the African Businesses as irrelevant. (Mot. at 2-4, 6.) That is simply not true. Freddy cherry-picks a select portion of the English Court's ruling, omitting that the Court expressly acknowledged the relevance of the African Businesses to the provision and receipt of Parker Services and quantifying Moussy's damages:

> I am not going to direct issue 9(a) to (e) [categories not requested by the Subpoena] to be part of the list of issues for disclosure. They can all go. The reason is that I do not consider the broad issues of the African business to be a key issue in these proceedings. I note that there is evidence of a wider family dispute in which these documents may be relevant but my decision is not based on the allegation of collateral purpose, it is based on relevance. . . . **To put the Parker services in context, I have considered that carefully and I have decided that the Parker services are sufficiently contextualized by issue 8(b), which is what services did Parker supply to Morsgate pursuant to the Parker Logistics agreement, and the remainder of the other issues in 8, including 8(g), which we kept in[.]**

(Decl. of J. Michaelson, Ex. B at 40-41 (emphasis added).) And, critically, in permitting Disclosure Category No. 8—which concerns the provision of Parker Services to "persons other

---

[1] Regardless, JPM did not have records responsive to Request Nos. 2 and 7-10, so any objections Freddy may have to these requests are moot.

than Morsgate," payments made for those services, and the "terms" and "circumstances" of those services[2]—the English Court further stated:

> I can see very clearly how the size and scope of the business opportunity which you say has been transferred away from [Monline International] and then the claimant, and therefore the claimant's cause of action. **I can see how the extent of that business opportunity – to assess the extent of that business opportunity, an analysis would need to be made about what Parker services were being supplied and to whom. I can see how that is relevant to, to put it broadly, quantum**.

(*Id.* at 23 (emphasis added); *see also* 5/1/24 Decl. of S. Goldring ¶ 8.)  Likewise, in an exchange with Moussy's UK counsel, the English Court expressly acknowledged the importance of valuing Parker Services provided to the African Businesses to rebut Defendants' position that the asset transfer was a "small fry."

> English Court: You have required them to prove . . .

> Moussy's Counsel: Yes.

> English Court: . . . benefits that [Defendants] have received from the supply of Parker services under the 2016 agreement or otherwise . . .

> Moussy's Counsel: Yes.

> English Court: . . . **to other companies within the African business** . . .

> Moussy's Counsel: Yes.

> English Court: . . . or from other trading activities of [Monline UK]?

> Moussy's Counsel: Yes.

---

[2] Disclosure 8 encompasses, *inter alia*, the following categories that are aligned with Moussy's requests in the Subpoena: (i) "Did [Monline UK] cease to supply Parker Services to Morsgate after 1 August 2016 and if so when and in what circumstances?"; (ii) "Has [Monline UK] supplied Parker Services or other services to persons other than Morsgate and if so when, on what terms and in what circumstances?"; and (iii) "What payments has [Monline UK] received since 7 June 2016 from persons other than Morsgate and what has become of them?"  (Decl. of J. Michaelson, Ex. C at 4-5.)

<u>English Court</u>: You have required them to prove what they have said in their defence, which is that it is a small fry.

<u>Moussy's Counsel</u>: Yes.

<u>English Court</u>: Let us go back to the list of issues for disclosure. Bearing in mind that you have required them to prove the source of income for the business that they did. **I can see how [8](h) directly reflects your requirement for proof of that point**.

<u>Moussy's Counsel</u>: Yes, and [8](g) is really the companion piece to that, because (g) is directed to identifying who the trading partners were, and [8](h) is directed to identifying what the results were, so we would say those are squarely issues which are on the pleadings . . .

<u>English Court</u>: Yes.

(Decl. of J. Michaelson, Ex. B at 25-26; *see also* 5/1/24 Decl. of S. Goldring ¶ 9.) Recognizing the relevance of this evidence, the English Court approved Disclosure Categories 8(h) and (g). (Decl. of J. Michaelson, Ex. B at 28-29; *see also id.*, Ex. C at 5 (Disclosure Categories 8(h) and (g)).) Through his Application, Moussy seeks to do exactly what the English Court endorsed—assess the extent of the business opportunity diverted from Monline International to ascertain whether he was paid fair consideration and the quantum of his damages. Critically, not even Freddy disputed the relevance of this information in the English Proceedings; rather, he objected only to the method of disclosure required to respond to these requests. (*See id.*, Ex. B at 26 (counsel for Freddy stating, "I think the disagreement between the parties on issue 8 is not so much as to 8(g) and (h) is as to the disclosure model, as to whether one requires a search as opposed to model (b). I think that is the difference between the parties").)[3]

---

[3] For these reasons, Freddy's contention that "Moussy's counsel admitted in the English Case that the African businesses had at best limited and narrow relevance," *i.e.*, "to establish the relationship of the African business of [Salim Levy and Ezra Aghai]" is a gross misrepresentation. (*See* Mot. at 6.) Freddy takes this statement completely out of context; Moussy's counsel was referring to the purpose of Disclosure Category No. 9, which, again, sought discovery that Moussy does not request here. (*See* 5/1/24 Decl. of S. Goldring ¶¶ 12-17.)

Accordingly, the English Court has already determined that the type of information Moussy requests through the Subpoena is relevant.  The Subpoena requests are also consistent with the broad categories of discovery ordered by the English Court.  One of the so-ordered categories, for example, is the tracing of "any assets transferred to [Monline UK] from [Monline International] at the time of the UK Transfer [] or any assets derived from them."  (Decl. of J. Michaelson, Ex. C at 5 (Disclosure Category No. 10(b)).)  This request encompasses the tracing of the right to provide Parker Services, which can be determined by, *inter alia*, examining financial records showing the flow of funds between various entities (or changes to those flows).  (*See* 5/1/24 Decl. of S. Goldring ¶ 10.)  Moreover, "any assets derived" from the unlawful transfer encompasses fee revenue generated from the provision of Parker Services, which, again, is informed by the scope of the operations of the African Businesses.  (*Id.*)  The Subpoena requests are also consistent with Disclosure Category No. 8, which concerns Monline UK's provision of Parker Services to "persons other than Morsgate" and payments received for those services.  (Decl. of J. Michaelson, Ex. C at 4-5.)

Freddy further contends that the Subpoena's request for documents concerning Transglobe Logistics Management Limited and Glynfield Finance Limited should be rejected because they "are not relevant to the English Case, as evidenced by the fact that they were not even part of the discovery that Moussy requested in the English Case."  (Mot. at 7.)  Freddy's position, however, confirms that the English Court did not deny the discovery Moussy seeks here.  It also ignores the Second Circuit's direction that a "district court may not refuse a request

12

for discovery pursuant to § 1782 [just] because a foreign tribunal has not yet had the opportunity

to consider the discovery request." *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997).[4]

## II.    MOUSSY'S APPLICATION SATISFIES THE *INTEL* DISCRETIONARY FACTORS.

### A.    Moussy's Application Does Not Implicate Foreign Proof-Gathering Restrictions.

One of the discretionary factors under *Intel* is "whether the § 1782 request conceals an

attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country

or the United States." *Intel*, 542 U.S. at 264-65.  "[P]roof-gathering restrictions are best

understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials,

rather than as rules that *fail to facilitate* investigation of claims." *Mees*, 793 F.3d at 303 n.20; *see

also Refinería*, 2024 WL 95056, at *10 (same).  It is Freddy—not Moussy—who bears the

burden of presenting "authoritative proof" of circumvention, such as a "pronouncement from the

[foreign] court . . . that would lead [this Court] to question whether [a] discovery order [would]

trench[] upon foreign law or [would] otherwise interfer[e] with the [foreign] proceedings." *In re

Niedbalski*, 2023 WL 5016458, at *8 (S.D.N.Y. May 8, 2023) (quoting *Application of Esses*, 101

F.3d 873, 877 (2d Cir. 1996)); *see also In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d

Cir. 2019) (affirming Section 1782 application where applicants admitted they could not obtain

the discovery in the foreign proceedings, but respondent had not made any showing that

discovery was "prohibit[ed]" by foreign court); *Refinería*, 2024 WL 95056, at *11 (finding

circumvention factor favored discovery where respondent did not show foreign proof-gathering

---

[4] Freddy's suggestion that Moussy's Application was brought in bad faith (Mot. at 8) is a non-starter; Moussy has explained at length the legitimate reasons for his Application.  The case Freddy cites is also plainly distinguishable. *See In re Postalis*, 2018 WL 6725406, at *5 (S.D.N.Y. Dec. 20, 2018) (holding "for use" requirement not met based on applicant's public statements that it sought discovery for "filing a future lawsuit in the United States" rather than for the foreign proceeding).

restrictions "prohibiting" the requested discovery).  Here, Freddy has failed to show any "authoritative proof" of "rules akin to privileges" that prohibit the use of the requested discovery in the English Proceedings.  Indeed, the English Court has *ordered* similar discovery in those proceedings.

Instead, Freddy contends that the English Court's purported denial of Moussy's discovery requests evince an "attempt[] to circumvent the English Court's rulings and procedures."  (Mot. at 8-9).  Again, that is not the law.  Even had the English Court rejected Moussy's requests (it did not), as the Second Circuit has made clear time and again, "the mere fact that the discovery sought here might not be obtainable under [English] law does not, by itself, suggest that [Moussy's] application is an attempt to circumvent foreign proof-gathering restrictions." *O'Keeffe*, 650 F. App'x at 85; *see also Mees*, 793 F.3d at 303 (in assessing circumvention factor, noting "§ 1782 contains no foreign-discoverability requirement" and that courts cannot "authorize denial of discovery pursuant to § 1782 solely because such discovery is unavailable in the foreign court"); *Metallgesellschaft*, 121 F.3d at 79-80 (reversing district court's decision to vacate subpoena on basis that discovery "would not be afforded" in the foreign court "if the matter were before the [foreign] court" because "foreign discoverability cannot be used, consistent with the language and purpose of § 1782, as such a blunt instrument" to deny a Section 1782 application); *Refinería*, 2024 WL 95056, at *10 (Section 1782 "does not limit a district court's authority to require the production of documents to materials that could be discovered in the foreign jurisdiction if the materials were located there.").  Indeed, in *Intel* the European Commission—the foreign tribunal in which the discovery was to be used—expressly stated to the Supreme Court in *amicus curiae* briefs that it "d[id] not need or want" Section 1782 assistance; nevertheless, "the Supreme Court did not indicate that the European Commission's

position precluded granting the application." *Mees*, 793 F.3d at 303 n.21 (quoting *Intel*, 542 U.S. at 265). As this Court correctly acknowledged at the April 16, 2024, hearing, "the showing that this was an effort to circumvent the U.K. proceedings and obtain documents that the U.K. court expressly indicated that it was not receptive to reviewing and receiving is a high burden." (Dkt. 23, 4/16/24 Hearing Tr. 16:22-17:1.)

In *In re Chevron Corp.*, 633 F.3d 153 (3d Cir. 2011), the Third Circuit addressed—and rejected—the very arguments Freddy makes here. In *Chevron*, the opponents of a Section 1782 application argued that the application sought to circumvent foreign proof-gathering restrictions because the foreign court had allegedly "denied Chevron's requests for these same documents." *Id.* at 163. The Third Circuit disagreed, finding that "regardless of the [foreign court's] disposition of Chevron's request for the documents, it is plain that appellants' argument conflates the question of whether a foreign court would allow analogous discovery leading to the production of documents with the question of whether that court would consider evidence revealed in a section 1782 proceeding." *Id.* That is because a foreign court "might offer limited discovery opportunities yet accept relevant evidence tendered to it if procured without its assistance." *Id.* Accordingly, the court held that "it would be a stretch to conclude that the section 1782 proceeding was an attempt to circumvent [foreign] restrictions that somehow was offensive to the [foreign court]." *Id.* So too here.[5]

---

[5] The cases Freddy cites (Mot. at 8-9) are in accord that "proof-gathering restrictions" are "rules akin to privileges," not merely, as Freddy insists, a foreign court's decision to not order the discovery itself. *See In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *8-9 (S.D.N.Y. Sept. 6, 2023) (holding circumvention factor favored discovery where respondent "presented no indication that any [] rule or policy exists" in the UK that "bar[s]" evidence to support defamation defense); *In re Top Matrix Holdings, Ltd.*, 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020) (holding circumvention factor favored discovery where respondent was "unable to point to any specific Swiss [confidentiality] policy that [applicant's] request would circumvent," and Swiss court had not issued any negative discovery ruling barring use of requested

Nor has Freddy presented any "authoritative proof" that Moussy brought his Application in bad faith. *See Refinería*, 2024 WL 95056, at *10 ("[T]o demonstrate circumvention, a respondent must illustrate that the applicant is engaged in a bad faith endeavor to misuse Section 1782.") (alterations omitted). Freddy suggests that Moussy seeks this discovery in bad faith for collateral purposes in connection with "a wider family dispute." (*See* Mot. at 8 & n.2.) Even if that were true (it is not), "ancillary benefits that may accrue to a Section 1782 petitioner do not weigh against a meritorious application." *In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *11 (S.D.N.Y. Sept. 6, 2023) (finding no bad-faith circumvention where intervenor alleged Section 1782 discovery might be used for other purposes); *In re Al-Attabi*, 2022 WL 229784, at *9 (S.D.N.Y. Jan. 26, 2022) ("[P]rovided the statutory and discretionary criteria are satisfied, as they are here, a Section 1782 application should not be denied merely because the discovery material may have potential other uses by the petitioner."). Here, Moussy simply seeks discovery in good faith to help him prosecute his claims in the English Proceedings. Freddy's arguments to the contrary are without merit.[6]

---

discovery); *Accent Delight*, 791 F. App'x at 251 (affirming circumvention factor favored discovery where respondent failed to show "that the policy or restrictions of any relevant foreign jurisdiction *prohibit* the discovery sought by Petitioners"). The court in *In re Kreke Immobilien KG*, 2013 WL 5966916, at *6-7 (S.D.N.Y. Nov. 8, 2013), held against the applicant where the applicant had not previously sought the discovery from the foreign tribunal because the tribunal lacked the authority to order the requested discovery. The court surmised the applicant was attempting to "avoid . . . an unfavorable discovery decision." *Id. Kreke*, however, is inconsistent with the Second Circuit's direction that Section 1782 imposes neither an exhaustion nor discoverability requirement. *See Mees*, 793 F.3d at 303-04. The case *Kreke* cites, however, for its "unfavorable discovery decision" point confirms, as Freddy's other cases, that "proof-gathering restrictions" are "rules akin to privileges." *See In re Microsoft Corp.*, 428 F. Supp. 2d 188, 195-96 (S.D.N.Y. 2006) (holding application sought to circumvent European Commission's "rules on confidentiality").

[6] Left with no authority to support his position, Freddy refers to general principles of comity. (*See* Mot. at 9-10.) To start, as explained, these comity arguments are misplaced because the English Court did not deny the discovery Moussy requests here. Moreover, as the Supreme Court has made clear, "[w]hile comity and parity concerns may be important as touchstones for a

**B.    Moussy's Requests Are Not Unduly Burdensome.**

Finally, Freddy contends that Moussy's requests are "unduly intrusive or burdensome" because they are purportedly "irrelevant to the English Case." (Mot. at 10-11.) As a preliminary matter, Freddy's burden argument makes no sense considering that JPM has already produced responsive documents and did not raise any burden objection. Indeed, although Freddy spills much ink characterizing the requests as an "extensive" dive into "records for ***seventy-nine*** different African Businesses and several other entities" (Mot. at 3-4, 6, 10 (emphasis in original)), the reality is that JPM produced only seven spreadsheets with limited (but relevant) information concerning payments between a narrow subset of those businesses—all of which has been shared with Freddy. The discovery requested and received is not the expansive fishing expedition Freddy would have this Court believe.

In any event, courts in this Circuit make clear that when assessing the *Intel* burden factor, "where the substantive issues presented in the foreign litigation are to be decided by a foreign court applying unfamiliar foreign law, a district court should be permissive when assessing relevance." *Refinería*, 2024 WL 95056, at *11; *see also Sveaas*, 249 F.R.D. at 107 (noting "the court should be particularly wary of denying discovery on relevance grounds" and holding "[g]iven the broadly permissive standard by which a court evaluates the relevance of discoverable material, and the parties' presentation of a factual dispute regarding the relevance of the discovery sought, it is inappropriate to deny [applicant's] discovery requests on the ground that the requested discovery is irrelevant to [applicant's] foreign claims"). Nor do courts limit discovery under Section 1782 to the scope of discovery available in the foreign proceeding, as "[f]ew if any foreign jurisdictions permit the scope of discovery available in our courts." *Mees*,

_____

district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discovery rule into the text of § 1782(a)." *Intel*, 542 U.S. at 261.

793 F.3d at 302.  Rather, courts assessing burden "appl[y] the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."  *Id.*

As explained, Moussy sought information from JPM regarding the provision and receipt of Parker Services, payments for and the value of those services, whether those services are still provided today, and if so, who provides them.  *See In re Nat'l Bank Tr.*, 2023 WL 2386392, at *11 (D. Conn. Mar. 7, 2023) (holding applicant's "requests for bank statements" are "proper subjects of discovery under Section 1782").  This information is highly relevant to evaluating, *inter alia*, what should have constituted valuable consideration for the transfer of Parker Services to Monline UK and proving the damages Moussy and Monline International suffered as a result of the transfer.  This discovery was also blessed by the English Court.

The cases Freddy cites (Mot. at 10-11) are plainly inapposite and do not come close to addressing the factual circumstances here.  *See In re Okean B.V. & Logistic Sol. Int'l*, 60 F. Supp. 3d 419, 428, 432-33 (S.D.N.Y. 2014) (holding requested discovery overly burdensome to *subpoena respondent*—not intervening foreign defendant—because requests sought privileged material and respondent would face potential sanctions for breaching foreign laws preventing disclosure); *In re Harbour Victoria Inv. Holdings Ltd.*, 2015 WL 4040420, at *7-8 (S.D.N.Y. June 29, 2015) (holding Section 1782 application was improper fishing expedition where no foreign litigation had been commenced, but noting "[h]ad petitioner[] filed a lawsuit before submitting this application for discovery, this concern would be mitigated"); *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245-48 (2d Cir. 2018) (holding application improperly sought documents protected by confidentiality order).

For these reasons, this Court properly granted Moussy's Application.  Freddy's objections are meritless.

### III.    MOUSSY HAS MET HIS RULE 45 OBLIGATIONS

It is well-settled that "it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*." *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) (collecting cases).  Accordingly, the Court properly granted Moussy's Application without prior notice to Freddy.  Freddy, however, argues that the Court should quash the Subpoena and enter a protective order because Moussy issued the Subpoena to JPM before noticing Freddy, and makes the significant and conclusory accusation that Moussy "hoped to obtain the documents before Freddy or the other defendants in the English Case learned of the Application and had a chance to object." (Mot. at 11-12.)  For the avoidance of doubt, any lack of prior notice was inadvertent and not intended to conceal this proceeding from Freddy (*see* Dkt. 23, 4/16/24 Hearing Tr. 8:24-9:2), and Moussy has since served Freddy and all other defendants with a copy of the Subpoena and all JPM productions (*see* Dkt. 15 at 1).

In any event, Freddy's request for relief is improper because he has suffered no prejudice from any delayed notice.  "[C]ourts in this Circuit routinely decline to quash subpoenas automatically based on noncompliance with notice requirements absent some showing of prejudice." *In re Reyes*, 2019 WL 6170901, at *3 (S.D.N.Y. Nov. 20, 2019).  In Section 1782 proceedings, where the foreign defendant is permitted to intervene and challenge an already-issued subpoena on its merits, and the court nevertheless affirms its prior decision to grant the application, there is no prejudice.  *See In re Hornbeam Corp.*, 2015 WL 13647606, at *8 (S.D.N.Y. Sept. 17, 2015), *aff'd*, 722 F. App'x 7 (2d Cir. 2018) ("[Foreign defendant] cannot have been prejudiced by his inability to file . . . a motion to quash the subpoenas at an earlier date, as such a motion would not have been granted . . . .").  As this Court correctly acknowledged at the April 16, 2024, hearing, the sole remedy is to provide the intervening defendant with a copy of the subpoena and any documents produced in response, which Moussy

19

has already provided to Freddy.  (*See* Dkt. 23, 4/16/24 Hearing Tr. 14:15-17); *see also*

*Hornbeam Corp.*, 722 F. App'x at 11.

Freddy's sole justification for his requested relief is that he "has been prejudiced because Moussy's misconduct has deprived Freddy of the benefit of the English Court's ruling in his favor."  (Mot. at 12.)  As explained, the English Court never denied the type of discovery Moussy seeks here, and even if it had, that is not a colorable basis to quash the Subpoena. Because Freddy has suffered no prejudice, his Motion should be denied.

## **CONCLUSION**

For the foregoing reasons, Moussy respectfully requests that the Court deny Freddy's Motion.

Dated: May 2, 2024

Respectfully submitted,

**BROWN RUDNICK LLP**

By: _/s/ Lauren Tabaksblat_
    Lauren Tabaksblat
    (Bar No. 4699351)
    Tyler D. Purinton
    (Bar No. 5869664)

    7 Times Square
    New York, New York 10036
    Telephone: (212) 209-4800
    Facsimile: (212) 209-4801
    ltabaksblat@brownrudnick.com
    tpurinton@brownrudnick.com

    *Counsel for Applicant Moussy Salem*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2024, I caused a copy of the foregoing Opposition to Freddy Salem's Motion to Quash Subpoena and For a Protective Order to be served through the Court's ECF system upon counsel of record.

Dated: May 2, 2024

By: */s/ Lauren Tabaksblat*
Lauren Tabaksblat
(Bar No. 4699351)
7 Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
ltabaksblat@brownrudnick.com