UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                 :

In re Application of                         :

                                 :

MOUSSY SALEM,                       :

                               :        24 Misc. 5 (JPC)

                Applicant,        :

                               :      OPINION AND ORDER

FOR AN ORDER TO TAKE DISCOVERY PURSUANT :
TO 28 U.S.C. § 1782 FROM JPMORGAN CHASE  :
BANK, N.A.                       :

                               :

------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Pending before the High Court of Justice, Business & Property Courts of England and Wales, Business List (ChD) (the "English Court") is a civil case (the "English Proceedings") involving members of the Salem family and an alleged misappropriation of assets. On January 3, 2024, Moussy Salem, the claimant in those proceedings, filed an *ex parte* application pursuant to 28 U.S.C. § 1782 for leave to take discovery, in the form of a subpoena *duces tecum* (the "Subpoena"), from JPMorgan Chase Bank ("JPM") purportedly for use in that matter. Finding that the application satisfied the statutory requirements under Section 1782 and exercising its discretion under the statute, this Court granted Moussy's request on January 23, 2024. Two days later, Moussy served the Subpoena on JPM, which produced the requested documents by February 14, 2024. But Moussy apparently had failed to provide notice to the defendants in the English Proceedings before he served the Subpoena on JPM. One of those defendants, Moussy's uncle, Freddy Salem, intervened in the instant action and now moves to quash the Subpoena and requests a protective order requiring Moussy to destroy the documents and prohibiting him from using them for any purpose. For the reasons below, the Court denies Freddy's motion and request.

## I.  Factual Background[1]

### A.    The Salem Family's Management of the African Businesses

The Salem family manages trading businesses in West Africa (the "African Businesses"), whose operations entail the importation and distribution of consumer products including pharmaceuticals, tobacco products, personal care, food, alcoholic and non-alcoholic beverages, and confectionary.   8/1/2023 Goldring Decl., Exh. C (Moussy's response in the English Proceedings to certain of the defendants' requests for further information) ¶¶ 4-5.  The family is composed of four "branches" corresponding to each of Moussa Salem and Perla Ishaak Yael's children: (1) the late Raymond Salem and his family, which includes Petitioner Moussy (the "R Branch"); (2) Beno Salem and his family (the "B Branch"); (3) Freddy Salem (Intervenor in this action) and his family (the "F Branch"); and (4) Isaac Salem and his family.  *Id.* ¶ 4.  As

---

[1] In connection with his Section 1782 application, Dkt. 2 ("Application"), Moussy provided a supporting declaration from Lauren Tabaksblat, a partner and co-Chair of the Litigation and Arbitration Practice Group at Brown Rudnick, LLP, who is lead counsel for Moussy in the instant application.  Dkt. 3 ("Tabaksblat Decl.").  Annexed to Ms. Tabaksblat's declaration is, among other exhibits, an August 21, 2023 declaration from Simon Goldring, a lawyer qualified in England and Wales and a partner at Maurice Turnor Gardner LLP, who represents Moussy in the English Proceedings.  *Id.*, Exh. 1 ("8/21/2023 Goldring Decl.").  That August 21, 2023 declaration, also supplemented by various exhibits, had been submitted in connection with a separate Section 1782 action to take discovery from Beno Salem before the United States District Court for the Southern District of Florida.  *See* Tabaksblat Decl. at 2 n.1; *see also In re Salem*, No. 23 Civ. 23186 (KMM) (S.D. Fla.), Dkt. 4-1.  In moving to quash the Subpoena, Freddy provides a supporting declaration from Justin Michaelson, a solicitor admitted in England and Wales and a partner at Quinn Emanuel Urquhart & Sullivan UK LLP, who represents Freddy in the English Proceedings.  Dkt. 20 ("Michaelson Decl.").   In connection with his opposition, Moussy provides an additional supporting declaration from Mr. Goldring.  Dkt. 26 ("5/1/2024 Goldring Decl."). The facts set forth in this section are largely drawn from these declarations and their accompanying exhibits. These facts are provided solely for contextual purposes, however, and should not be construed as factual findings.  The Court emphasizes that the background on members of the Salem Family and their management of the African Businesses largely reflects Moussy's representations in the English Proceedings; the Court takes no position on their veracity.

beneficiaries of certain family trusts, the R, F, and B Branches own the African Businesses in equal parts. *Id.*

Historically, Morsgate International Limited ("Morsgate") served as the treasury company for the African Businesses, forming part of a corporate structure through which profits earned by certain African Businesses were transferred up to these Salem family trusts. *Id.* ¶ 3(d). Specifically, profits generated by the African Businesses were paid to and held by Morsgate, which then transferred the money to upstream companies—primarily Glynfield Finance Limited ("Glynfield") and Transglobe Logistics Limited ("Transglobe"). *Id.* These companies in turn made payments to the trusts. *Id.* Pursuant to an agreement with Morsgate, an English Company called Parker Logistics ("Parker") provided logistical and management services to the African Businesses, including distribution, banking, information technology, training, management and oversight of employees, recruitment, interfacing with supplies, shipping, transportation and forwarding, warehousing, and purchasing (the "Parker Services"). *Id.* ¶ 3(c); *see also* Michaelson Decl., Exh. D ("Morsgate-Parker Agreement") at 17 (schedule of services); Application at 8. In return, Parker received service fees calculated in part based on a percentage of the costs incurred to provide those services and support the African Businesses' operations. *See* 8/21/2023 Goldring Decl. ¶ 12; *see also* Morsgate-Parker Agreement § 33 ("The Services Fee is the annual sum Morsgate will pay to Parker, in addition to reimbursing Parker for the costs of providing the Services as provided in the agreement.").

The R, F, and B Branches of the Salem family previously had overseen the African Businesses' operation equally. 8/21/2023 Goldring Decl., Exh. C ¶ 4. But in 2013, Moussy—who had taken over the R Branch's management of the African Businesses upon his father's incapacity in 1997—was allegedly "excluded" from such management, leaving the R Branch

members with only limited information on the African Businesses' operation. *Id.* ¶ 4(d)-(g). As further alleged, Moussy has been denied access to the email systems and physical offices used to run the African Businesses, namely those in connection with the provision of the Parker Services. 8/21/2023 Goldring Decl. ¶ 8.

In March 2016, the B and F Branches transferred management of the African Businesses, including the right to provide the Parker Services, from Parker to Monline International, Limited ("Monline International"), a British Virgin Islands corporation in which Freddy owned a fifty percent interest and Moussy and his mother beneficially owned the remaining fifty percent. *See id.*, Exh. A ("Amended Particulars of Claim") ¶¶ 5, 16(b); Application at 8. Shortly thereafter, Moussy agreed to a further transfer of management from Monline International to a newly-formed English company, Monline UK Limited ("Monline UK"), on the condition that the ownership structure remain the same and that Freddy and Moussy be appointed directors of the new company. 8/21/2023 Goldring Decl. ¶ 19(a)-(b). But around June 7, 2016, Freddy transferred the assets of Monline International, including the right to provide the Parker Services, to Monline UK (the "UK Transfer")—allegedly without Moussy's knowledge and for no or insufficient consideration. *Id.* ¶¶ 18-19. At that point, Monline UK, in which neither Moussy nor his mother in fact had any ownership interest, became the sole provider of the Parker Services. *Id.*; *see* Application at 2, 8-9.

**B.    The English Proceedings**

On October 12, 2020, a British Virgin Islands court ordered Monline International to be wound up. Amended Particulars of Claim ¶ 3. Having investigated Monline International's affairs, the court-appointed liquidators determined it was necessary to initiate a separate action in the United Kingdom against Freddy, Monline UK, and Monline UK's sole directors and

shareholders, Salim Levy and Ezra Aghai (together, the "English Defendants").[2]  Application at 9; *see also* Amended Particulars of Claim ¶ 3.

Accordingly, on October 4, 2022, proceedings commenced before the English Court, which assigned the prosecution of the case to Moussy, pursuant to a deed of assignment between Monline International and Moussy.  *See* 8/21/2023 Goldring Decl. ¶ 4; Amended Particulars of Claim ¶ 1. Almost a month later, on November 2, 2022, Moussy submitted the Amended Particulars of Claim, in which he alleges that: (1) Freddy breached his duty to Monline International for causing and/or permitting the UK Transfer; (2) the UK Transfer was a gratuitous transfer; and (3) through the UK Transfer, Freddy and Monline UK conspired to divest Monline International of its assets to place those assets out of Moussy's reach.  Amended Particulars of Claim ¶¶ 25-36.  Moussy seeks, among other forms of relief, equitable compensation for the business Monline International lost as a result of the UK Transfer.  *Id.* ¶ 37.

On July 11, 2023, Moussy learned (through certain of the English Defendants' admissions in the English Proceedings) that in or around July 2017 a newly-formed Lebanese company called Gestcom Trading ("Gestcom"), one of the African Businesses, replaced Morsgate as the recipient of the Parker Services.  8/21/2023 Goldring Decl. ¶¶ 10-11.  Moussy also learned that in or around March 2021, Monline UK stopped providing the Parker Services.  *Id.* ¶ 11.

On July 19, 2023, the English Court held a hearing to set the issues for disclosure (*i.e.*, discovery).  5/1/2024 Goldring Decl. ¶ 7; Michaelson Decl. ¶ 7; *see also* Michaelson Decl., Exh. B ("7/19/2023 English Ct. Hr'g Tr.").  Under relevant rules in the English Court, these issues are agreed upon by the parties or determined by the English Court and must arise from the pleaded

---

[2] Salim Levy died during the course of the English Proceedings; the executor of Salim Levy's estate, Ighal Levy, is now the fourth defendant.  *See* 5/1/2024 Goldring Decl. ¶ 1.

cases of the parties.  Michaelson Decl. ¶ 5.  In advance of the hearing, the parties in the English

Proceedings submitted a draft including their proposed issues for disclosures and indicated any

areas of disagreement in that submission.  *Id.* ¶ 7; *see* Michaelson Decl., Exh. A ("Proposed

Issues").

> The English Court's determinations concerning two proposed issues of disclosures—*i.e.*,

Proposed Issues 8 and 9—bear on the instant dispute.  The disclosure requests under Proposed

Issue 8, captioned "Morsgate," included:

> a.) What role (if any) did [Freddy or Aghai] play in the management or affairs of Morsgate from 2013 onwards?
> b.) What services did Parker supply to Morsgate pursuant to the 'Parker Logistics Agreement' dated 14 March 2000 from 2013 until 30 March 2016?
> c.) What services were provided to Morsgate by [Monline International] after 30 March 2016?
> d.) What payments were made to or for the benefit of [Monline UK] by Morsgate from 7 June 2016 to date and on what basis?
> e.) What became of those payments?
> f.) Did [Monline UK] cease to supply Parker Services to Morsgate after 1 August 2016 and if so when and in what circumstances?
> g.) Has [Monline UK] supplied Parker Services or other services to persons other than Morsgate and if so when, on what terms and in what circumstances?
> h.) What payments has [Monline UK] received since 7 June 2016 from persons other than Morsgate and what has become of them?

Proposed Issues at 5-7.  For Proposed Requests 8(b) through 8(h), the parties proposed Model D[3]

as the method of disclosure, *id.*, except that Freddy requested the removal of Request 8(g) and the

removal of "persons other than" in Request 8(h), *id.* at 6 n.11, 12.

> In advocating for the retention of Request 8(g), Moussy's counsel explained that the issue

concerning Monline UK's supplying the Parker Services to entities other than Morsgate arose in

---

[3] "Model D" refers to a "specific type of disclosure under which the parties must agree [to] the scope of parameters for a search of documents (key words, custodians and date ranges) and the party ordered to search must then disclose documents directly relevant to that issue and adverse to its case."  *See* Michaelson Decl. ¶ 10.

connection with Monline UK's and Aghai's admissions that sometime in 2017, Monline UK had

stopped providing the Parker Services to Morsgate and started providing them to Gestcom.

7/19/2023 English Ct. Hr'g Tr. at 22.  He urged that, as a result, "the question of the provision of

services and trading with parties other than Morsgate is part of our pleaded case in the amended

particulars of claim in that it arises from our claims for relief and to trace assets and for accounts

of profits." *Id.*  The English Court readily accepted the relevance of that information as to quantum

(*i.e.*, the amount of damages), but not as to liability:

> I can see very clearly how the size and scope of the business opportunity which you
> say has been transferred away from [Monline International] and then [Moussy], and
> therefore [Moussy]'s cause of action.  I can see how the extent of that business
> opportunity—to assess the extent of that business opportunity, an analysis would
> need to be made about what Parker services were being supplied and to whom.  I
> can see how that is relevant to, to put it broadly, quantum.
>
> I am less clear as to how it is relevant to liability.

*Id.* at 23.  Moussy's counsel thus elaborated that the Proposed Issue 8(g) information

> would be relevant to what [Moussy] say[s] about who owns [Monline UK], and
> hence what was going on when there was the UK transfer in 2016.  Obviously, if
> one sees a pattern of [Monline UK] being used at the direction of [Freddy] to do
> various things in the African business, well that does support [Moussy's] case that
> [Freddy] is the beneficial owner of [Monline UK], and always has been.

*Id.* at 24.  While it recognized the broad relevance of the information, the English Court further

pressed Moussy's counsel to demonstrate the connection between that request and the content of

the pleadings.  *Id.* ("[English Court]: I can see the relevance to your case generally.  Where is it

pleaded?").  Moussy's counsel responded that the request pertained to Moussy's "central"

allegation that the UK Transfer involved the transfer of a "valuable business," insofar as Freddy

had taken the position that the 2016 agreement between Monline UK and Morsgate (concerning

the right to supply the Parker Services) was "less advantageous" than the earlier agreement

between Parker and Morsgate, and that Monline UK, as a result, "earned a small revenue and made modest profits." *Id.* at 25.  The English Court appeared to agree:

| | |
|---|---|
| [English Court]: | You have required them to prove . . . |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | . . . benefits that [Defendants] have received from the supply of Parker services under the 2016 agreement or otherwise . . . |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | . . . to other companies within the African business . . . |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | . . . or from other trading activities of [Monline UK]? |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | You have required them to prove what they have said in their defence, which is that it is a small fry. |
| [Moussy's Counsel]: | Yes. |
| [English Court]: | Let us go back to the list of issues for disclosure.  Bearing in mind that you have required them to prove the source of income for the business that they did.  I can see how [8](h) directly reflects your requirement for proof of that point. |
| [Moussy's Counsel]: | Yes, and [8](g) is really the companion piece to that, because (g) is directed to identifying who the trading partners were, and [8](h) is directed to identifying what the results were, so we would say those are squarely issues which are on the pleadings . . . |
| [English Court]: | Yes. |

*Id.* at 25-26.  As such, the English Court approved the inclusion of Request 8(g) over Freddy's objection, which entailed disagreement not on the relevance of the information but rather the specific method of disclosure proposed.  *Id.* at 26 ("[Freddy's counsel]: Sir, if I may, I think the disagreement between the parties on issue 8 is not so much as to 8(g) and (h) is as to the disclosure

model, as to whether one requires a search as opposed to model (b).  I think that is the difference between the parties."), 28-29; *see also* Michaelson Decl., Exh. C (the English Court's "Disclosure Review Document") at 4 (reflecting inclusion of all requests under Proposed Issue 8).

Next, Proposed Issue 9, captioned "African Business" included the following requests:

a) What was the composition of the trading business in Africa associated with the Salem family (African Business) from 2013 onwards and how did it operate[]?
b) What role did Morsgate play in the African Business from 2013 onwards?
c) What role did Parker play in the African Business from 2013 until 30 March 2016?
d) What role did [Moussy, Freddy, Levy, and Aghai] play in the African Business, Morsgate, Parker and [Monline UK] from 2013 onwards?
e) What role did [Monline UK] play in the African Business from 7 June 2016?

Proposed Issues at 7-8.  Freddy further requested the exclusion of all of Issue 9.  *Id.* at 7 n.13.

Moussy's counsel maintained that these requested disclosures—characterized by the English Court broadly as concerning "the composition of the African Business from 2013 onwards and how it operated," 7/19/2023 English Ct. Hr'g Tr. at 31—pertained to "the relationship between [Freddy, Levy, and Aghai]," the determination of who really owns Monline UK, and the inquiry into each Defendant's role in effectuating the UK Transfer, particularly given Moussy's position that "there was a live relationship between [Aghai] and Morsgate and [Freddy] and Morsgate." *Id.* at 29.  While the English Court seemed to appreciate Moussy's use for such information, it nonetheless decided to excise the entirety of Proposed Issue 9, considering its sheer breadth as written as well as its overlap in scope with other approved disclosure issues:

I am not going to direct issue 9(a) to (e) to be part of the list of issues for disclosure. They can all go.  The reason is that I do not consider the broad issues of the African business to be a key issue in these proceedings. . . .  It seems to me that the main relevance of the African business is [Levy's and Aghai's] role in it. To put the Parker services in context, I have considered that carefully and I have decided that the Parker services are sufficiently contextualised by issue 8(b), which is what services did Parker supply to Morsgate pursuant to the Parker Logistics agreement, and the remainder of the other issues in 8, including 8(g), which we kept in[.]

* * *

> As for [Levy's and Aghai's] role in the Africa[n] business, I consider that to be
> sufficiently covered by 7(a),[4] subject to one point which is a broadening of the
> model for extended disclosure to model D plus narrative documents, or with
> narrative documents.[5]  That should give the claimants sufficient material to
> consider to properly understand [Levy's and Aghai]'s role in the African business.

*Id.* at 40-41; *see also id.* at 32 ("[English Court]: *I agree you need to understand what the African*

*business [was]*, but that is not the test for whether you get model D disclosure on it, or any

disclosure on it.  [I] can see how on that pleading you might be entitled to documents relating to

[Levy and Aghai]'s function in the African business, and their relationship with [Freddy], I can

see how that might be—I can see how you might get that from your 9(d) and (e) . . . ." (emphasis

added)), 39 ("[English Court]: It seems to me that the best way to address [Levy and Aghai]'s

involvement in the African businesses is by looking at 7(b) again and considering whether that is

sufficient to throw up documents surrounding their involvement in the African business which

would provide what might be similar fact evidence about nomineeship here, or indeed sort of low

level employee type evidence.").

During the discussion with the English Court on Proposed Issue 9, Freddy's counsel briefly

referenced Moussy's Section 1782 petition in the Southern District of Florida to take discovery

from Beno Salem.  *Id.* at 37; *see also supra* n.1 (referring to that Section 1782 action).  The English

Court responded, "I have not looked at the US thing, I do not find it that helpful.  I recognize your

allegation that the claimant is looking for information about the African business.  All I need to

---

[4] It appears that the English Court, intending to refer to Request 7(b), mistakenly referred
to Request 7(a) here.  *See* 7/19/23 English Ct. Hr'g Tr. at 41.  Request 7(b) reads: "Do [Levy and
Aghai] hold their shares in [Monline UK] on trust for or as nominees for [Freddy]?"  Proposed
Issues at 5.

[5] Such narrative documents consist of "documents relevant to the background or context
of material facts and events regarding [an] issue."  Michaelson Decl. ¶ 10.

decide is whether it is a key issue in this case or not."  7/19/2023 English Ct. Hr'g Tr. at 37; *see also id.* at 38 ("[English Court]: You can take that up with the American courts if you want.").

At the conclusion of the July 19, 2023 hearing, the English Court scheduled the next hearing for September 20, 2024.  *Id.* at 63.

## II.  Procedural History

On January 3, 2024, Moussy filed an *ex parte* application pursuant to 28 U.S.C. § 1782 for leave to take discovery from JPM, the U.S. intermediary bank for payments made by Morsgate to Transglobe and Glynfield, purportedly for use in the English Proceedings.  Dkts. 1-3.  Specifically, Moussy sought documents concerning payments to and from Morsgate, Monline UK, Gestcom, Transglobe, Glynfield, and any of the African Businesses, as well as statements for any accounts held by these entities and documents showing the identities of any individuals or entities that maintained control over or instructed the payment of such monies through Morsgate, Monline UK, and Gestcom.  *See* Dkt. 1-1 ("Subpoena") at 11-12 (listing ten document requests).

In his application, Moussy maintained that this information could help determine the value of the Parker Services and thereby aid "the English [C]ourt in understanding the full chain of events surrounding the provision of Parker Services, the adequacy of the consideration paid for the transfer from Monline International to Monline UK, and the extent of Moussy's damages."  Application at 14.  Moussy further represented:

> [T]he English court has not denied similar discovery; indeed, the scope of the discovery sought aligns with the topics of party disclosure already permitted by the English court, including with respect to Morsgate's, Gestcom Trading's, and other unknown third parties' receipt of Parker Services; the amounts paid for those services; and whether those services are provided today.

*Id.* at 18; *see also id.* at 13 ("An order for disclosure has been given in [the English] proceedings, and the information sought from JPM is consistent with the information that the [English]

Defendants are required to disclose.").  Lastly, as to any potential burden on JPM, Moussy

explained that the discovery sought "should be readily available to JPM and relatively simple to

collect and produce," adding that he was willing to "engage in a good faith effort to meet and

confer over the parameters of [JPM]'s search to minimize any legitimate concerns."  *Id.* at 19.

On January 23, 2024, this Court found that the application met the statutory requirements

under 28 U.S.C. § 1782 and, having considered the relevant discretionary factors, granted the

application.  Dkt. 8.  Two days later, Moussy served the Subpoena on JPM, but did not provide

notice to the English Defendants before doing so.  *See* Dkts. 10, 11.  The Subpoena contained the

following document requests:

> 1. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Morsgate, including but not limited to monies to/from the account
> at Bank J. Safra Sarasin Ltd. in the name of Morsgate bearing account no. 601786
> as shown in swift transaction reference nos. 11005865700007P,
> 11005865670007P, 11005865780007P, 11005868570007P, and
> 11005868630007P, including but not limited to monies that [JPM] received and/or
> sent as an intermediary bank.
>
> 2. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Monline UK, including but not limited to monies to/from the
> account at Bank J. Safra Sarasin Ltd. in the name of Monline UK bearing account
> no. 606075, including but not limited to monies that [JPM] received and/or sent as
> an intermediary bank.
>
> 3. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Gestcom Trading, including but not limited to monies that [JPM]
> received and/or sent as an intermediary bank.
>
> 4. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Transglobe, including but not limited to monies to/from the account
> at Rothschild Bank International Ltd[.] in the name of Transglobe as shown in swift
> transaction reference nos. 11005865700007P, 11005865670007P,
> 11005865780007P, and 11005868630007P, including but not limited to monies
> that [JPM] received and/or sent as an intermediary bank.
>
> 5. All documents concerning actual or attempted payments and/or the transfer of
> monies to/from Glynfield, including but not limited to monies to/from the account
> at Rothschild Bank International Ltd[.] in the name of Glynfield as shown in swift

transaction reference no. 11005868570007P, including but not limited to monies that [JPM] received and/or sent as an intermediary bank.

6. All documents concerning actual or attempted payments and/or the transfer of monies to/from any of the African Businesses, including but not limited to monies that [JPM] received and/or sent as an intermediary bank.

7. All statements for any accounts held by Morsgate, Monline UK, Gestcom Trading, Transglobe, and/or Glynfield, whether held individually or jointly with another individual or entity.

8. All statements for any accounts of any of the African Businesses, whether held individually or jointly with another individual or entity.

9. Documents sufficient to show the identities of any individuals or entities with control over accounts with [JPM] on behalf of Morsgate, Monline UK, and/or Gestcom Trading.

10. Documents sufficient to show the identities of any individuals or entities who instructed the payment of monies to, from, or through [JPM] on behalf of Morsgate, Monline UK, and/or Gestcom Trading.

Subpoena at 11-12.  JPM apparently sent a series of rolling productions between February 8 and February 14, 2024.  Dkt 10 at 1 n.1; *see also id.* at 1 (Moussy's counsel explaining in a February 28, 2024 letter to this Court: "Moussy does not expect any further productions at this time.").

Unaware that JPM had already produced these documents, Freddy appeared in the instant action on February 26, 2024, requesting to be heard "before [JPM] is required to produce any documents in response to the subpoena issued pursuant to the Application."  Dkt. 9 at 1.  In that request, Freddy represented that "the English Court expressly rejected Applicant's requests for broad discovery into the African Businesses" and, citing Moussy's failure to provide Freddy with notice of his filing of the Section 1782 application, further argued that Moussy sought "not to obtain legitimate discovery 'for use' in a foreign proceeding, but rather to pry into unrelated (and previously settled) business affairs for other purposes."  *Id.*  at 1-2.  Moussy responded that, among other retorts, JPM had already complied with the Subpoena.  Dkt. 10 at 1.  The Court ordered the

parties to meet and confer on the issues, Dkt. 12, and in a joint letter later submitted to the Court on March 15, 2024, Moussy reported that he had shared the entirety of JPM's production with Freddy and further expressed his willingness to return the documents to JPM, "subject to [Freddy] stipulating to certain facts set forth in those documents that corroborate admissions made by defendants in the English Proceedings." Dkt. 15 at 3. Freddy "request[ed] a motion conference with the Court to seek a protective order, sanctions, an order quashing the improperly issued subpoena, and all other appropriate relief." *Id.* at 2.

On April 16, 2024, the Court held a conference, at which Moussy "concede[d] for the Court that the failure to serve here was inadvertent." Dkt. 23 ("4/16/2024 Conference Tr.") at 8:24-9:1. Moussy urged, however, that there was "absolutely no prejudice" given that he had already shared with Freddy the "handful of documents produced" by JPM, *id.* at 9:3-6, and further proposed stipulating to refraining from (1) using the produced documents outside of the English Proceedings and (2) requesting any further documents from JPM, *id.* at 17:8-18. Freddy countered that "the documents were not discoverable in the first place because they never should have been produced," *id.* at 18:6-10, and requested leave to file a motion to that effect. The Court granted Freddy's unopposed request to intervene in the action, and set a briefing schedule for Freddy's anticipated motion. *Id.* at 19:1-20:13.

Freddy filed the instant motion to quash the subpoena and request for a protective order on April 23, 2024. Dkt. 19 ("Motion"). Moussy responded on May 2, 2024, Dkt. 25 ("Opposition"), and Freddy replied roughly two weeks thereafter, Dkt. 27 ("Reply").

### III.  Legal Standard

Section 1782 provides in pertinent part:

The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use

in a proceeding in a foreign or international tribunal. . . . The order may be made . . . upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a). Pursuant to the statute, a district court is authorized to grant a Section 1782 request where: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

If these statutory requirements are met, a court then assesses whether it should exercise its discretion to grant the requested assistance in light of the following factors set out by the Supreme Court in *Intel Corp. v. Advanced Micro Device*s: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome." 542 U.S. 241, 264-65 (2004). In deciding whether to exercise its discretion to grant a Section 1782 application, a court considers the "twin aims" of the statute: "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018) (quoting *In re*

15

*Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997)).  "In pursuit of these twin goals, the statute

has, over the years, been given increasingly broad applicability."  *Brandi-Dohrn*, 673 F.3d at 80.

Courts may and routinely do resolve applications for discovery pursuant to Section 1782

through *ex parte* proceedings.  *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012).

These one-sided proceedings do not offend due process, given that the respondent—the party from

whom the discovery is sought—may later move under Federal Rule of Civil Procedure 45(c)(3) to

quash any such discovery request.  *Id.*  Parties against whom the requested information will be

used may also challenge the court's power to issue the subpoena under the terms of the authorizing

statute.  *In re Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997).

## IV.  Discussion

As a preliminary matter, the Court agrees with Freddy that Moussy ran afoul of Federal

Rule of Civil Procedure 45(a)(4) when he failed to serve notice and a copy of the Subpoena on

Freddy before serving it on JPM.  *See* Fed. R. Civ. P.  45(a)(4) ("If the subpoena commands the

production of documents . . . , then before it is served on the person to whom it is directed, a notice

and a copy of the subpoena must be served on each party."); *see also In re Edelman*, 295 F.3d 171,

178-79 (2d Cir. 2002) (holding that protections of Rule 45 apply to persons subpoenaed under

Section 1782); *In re Hornbeam Corp.*, No. 14 Misc. 424 (VSB), 2015 WL 13647606, at *5

(S.D.N.Y. Sept. 17, 2015) ("[U]nless the district court's authorizing order provides otherwise, a

party engaged in foreign litigation who serves a § 1782 subpoena *duces tecum* to obtain documents

for use in the foreign litigation must first serve notice on all parties to the foreign proceeding."),

*aff'd*, 722 F. App'x 7 (2d Cir. 2018).  As this noncompliance deprived Freddy of his opportunity

to move to quash the Subpoena before its February 22, 2024 compliance date, *see* Dkt. 10 at 1

(Moussy explaining that the Subpoena was served on January 25, 2024); Dkt. 8 (this Court

ordering JPM to respond to Subpoena within twenty-eight days of service), the Court considers Freddy's arguments in support of quashing the Subpoena without regard to the untimeliness of his motion. *See In re DMCA Section 512(h) Subpoena to YouTube (Google, Inc.)*, 581 F. Supp. 3d 509, 516 (S.D.N.Y. 2022) ("It is well settled that, to be timely, a motion to quash a subpoena must be made prior to the return date of the subpoena."); *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 320 (S.D.N.Y. 2018) (explaining that district courts have broad discretion to consider untimely motions to quash (citations omitted)), *aff'd*, 349 F. Supp. 3d 346 (S.D.N.Y. 2018).

Accordingly, the Court first turns to Freddy's arguments that Moussy's application fails to meet the statutory requirements under Section 1782 and that the discretionary *Intel* factors on balance weigh against granting Moussy's application, before considering the appropriate remedy for Moussy's failure to provide Freddy with the requisite notice.

## A.     Whether the Application was Appropriately Granted

In moving to quash the Subpoena, Freddy does not dispute that JPM resides in this District and that Moussy, as a party in the English Proceedings, is an "interested person." *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782 . . . ."); *see also* Tabaksblat Decl. ¶ 8 (asserting that JPM maintains multiple offices in Manhattan, New York); *id.*, Exh. 3 (Federal Deposit Insurance Corporation data showing JPM's Manhattan offices); 8/21/2023 Goldring Decl. ¶ 4 (explaining that Moussy took over the prosecution of the claims in the English Proceedings).

And as to the discretionary *Intel* factors, Freddy also does not dispute JPM's nonparticipation in the underlying English Proceedings—a circumstance that weighs in favor of granting Moussy's Section 1782 application. *See Intel*, 542 U.S. at 264 ("First, when the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for

§ 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").   Nor does Freddy meaningfully dispute the English Court's receptivity to Section 1782 discovery, as he refers to that second *Intel* factor only half-heartedly in a footnote, *see* Motion at 10 n.3.  *See Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) ("[B]ecause the arguments appear only in footnotes, they are not properly raised, and the Court is under no obligation to consider them."); *cf. United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

Rather, Freddy contends that the discovery sought is not "for use" in the English Proceedings, that Moussy seeks to circumvent the English Court's ruling on the scope of discovery, and that the Subpoena is unduly intrusive and burdensome.  At every turn, Freddy's arguments are predicated principally on the purported irrelevance of the discovery sought.

### 1.      Whether the Discovery Sought is "For Use" in the English Proceedings

The "for use" requirement of Section 1782 mandates that the discovery sought "be employed with some advantage or serve some use in the [foreign] proceeding."  *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015); *see also In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 175 (S.D.N.Y. 2020) (explaining that the burden imposed on a Section 1782 applicant under the "for use" requirement is *de minimis*).  The term "for use" is afforded a "broad interpretation," and the "sought-after evidence need not be admissible or even discoverable under the rules of the foreign jurisdiction."  *Deposit Ins. Agency v. Leontiev*, No. 17 Misc. 414 (GBD) (SN), 2018 WL 3536083, at *3 (S.D.N.Y. July 23, 2018) (internal citations omitted); *see also In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016) ("[O]ur precedents expressly forbid district courts from considering the discoverability of evidence in a foreign proceeding when ruling on a § 1782 application."). Nevertheless, "an applicant who fails to demonstrate that the evidence is *minimally*

relevant to the foreign proceeding" will not meet the "for use" requirement. *In re BonSens.org*, 95 F.4th 75, 80 (2d Cir. 2024) (emphasis added); *see also Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 n.7 (2d Cir. 2015) ("The relevance of the information sought may be necessary, however, insofar as it is difficult to conceive how information that is plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding.").

Here, Moussy has sustained his burden under the statute's "for use" requirement. As earlier discussed, JPM serves as the U.S. intermediary bank for payments made by Morsgate to Transglobe and Glynfield. Moussy has requested documents concerning payments to and from Morsgate, Monline UK, Gestcom, Transglobe, Glynfield, and any of the seventy-nine companies encompassed by the term "African Businesses," as well as the individuals or entities that controlled or directed payments through Morsgate, Monline UK, and Gestcom. *See* Subpoena at 11-12. Broadly, this information concerns the African Businesses' profits, which are "transferred through the Morsgate-Tranglobe/Glynfield pipeline." Application at 4. And, according to Moussy, the profits earned by the African Businesses in turn inform the value of the Parker Services, as "the fees generated from the provision of Parker Services were calculated based on a percentage of the expenditures incurred to provide those services and support the African Businesses' operations." 5/1/2024 Goldring Decl. ¶ 6; Tabaksblat Decl. ¶ 7; Application at 3-4; *cf.* Morsgate-Parker Agreement § 33 ("The Services Fee is the annual sum Morsgate will pay to Parker, in addition to reimbursing Parker for the *costs of providing the Services* as provided in the agreement." (emphasis added)).[6] Given that the UK Transfer included the transfer of the right to provide the Parker

---

[6] Freddy contests the notion that the fees generated from the provision of the Parker Services are informed by the African Businesses' profits. *See* Motion at 8 (describing Moussy's position as "groundless"). On the one hand, Freddy's English counsel urges that "the value of the 'Parker Services' was not determined on the basis of revenue generated from or expenditure

Services from Monline International to Monline UK, discovery on the value of the provision of those services would plainly "serve some use" in the English Proceedings, where the question of whether adequate consideration was paid for the UK Transfer is a key issue and Moussy's damages request is based on the lost business opportunity resulting from the UK Transfer.

On that score, Moussy represents that he intends to use the discovery in part to refute Freddy's position in the English Proceedings that the UK Transfer did *not* constitute the transfer of a "valuable business." *See* 5/1/2024 Goldring Decl. ¶ 6 ("[F]inancial records evidencing significant trading activity by the African Businesses, supported by the Parker Services, would directly refute [Freddy's] defence."). He further explains that the existence or absence of transfers after July 2021 from Morsgate (and potentially Gestcom) to Monline UK or other unknown parties would help determine whether the Parker Services are being provided to this day and, if so, by which entity. Application at 4; *see also* 5/1/2024 Goldring Decl. ¶ 6 ("[G]iven that Moussy does not know which entity currently provides Parker Services, he has been unable to obtain discovery directly showing the costs incurred by that unknown entity in the provision of Parker Services."). Lastly, he maintains that the discovery sought will "provide critical information to calculate the

_____

incurred by the African Businesses." Michaelson Decl. ¶ 21. And on the other hand, Moussy's English counsel declares that "financial records evidencing significant trading activity by the African Businesses, supported by the Parker Services, would directly refute [Freddy's] defence" concerning the value of the provision of the Parker Services. 5/1/2024 Goldring Decl. ¶ 6. The Court declines to referee this battle-by-affidavit and is satisfied by Moussy's representations— which appear consistent with the English Court's pronouncements, *see, e.g.*, 7/19/2023 English Ct. Hr'g Tr. at 23 (the English Court agreeing that "an analysis would need to be made about what Parker services were being supplied and to whom" in order to assess the "size and scope of the business opportunity" allegedly transferred away from Monline International)—for purposes of the instant matter. *Cf. In re Tiberius Grp. AG*, No. 19 Misc. 467 (VSB), 2020 WL 1140784 at *7 (S.D.N.Y. Mar. 6, 2020) ("[B]ecause the substantive issues presented in the foreign litigation are to be decided by a foreign court applying unfamiliar foreign law, the district court should be permissive when assessing relevance." (internal quotation marks omitted)).

equitable compensation and/or damages for the assets transferred out of Monline International."
Application at 4.  In light of these representations, this Court is satisfied that the discovery sought
is "for use" in the English Proceedings.

In the face of this showing, Freddy's contentions that the requested information is plainly
irrelevant to the issues in the English Proceedings are unpersuasive.

First and principally, Freddy maintains that the irrelevance of the subpoena requests for
financial records concerning the African Businesses (Subpoena Requests 6 and 8) is evidenced by
the English Court's pronouncement that "the broad issues of the African [B]usiness[es] [are not]
a key issue in [the English Proceedings]," which it made in connection with its rejection of
Proposed Issue 9 (captioned "The African Business") at the July 19, 2023 hearing.  Motion at 6;
*see* 7/19/2023 English Ct. Hr'g Tr. at 40; *see also* Michaelson Decl. ¶ 6.  The Court disagrees.

To start, Moussy does not seek through his Section 1782 application the category of
documents described in Proposed Issue 9.  As discussed at *supra* I.B, the putative requests included
under Proposed Issue 9 related to "the composition of the African Business from 2013 onwards,"
and encompassed documents concerning the role that each of Morsgate, Parker Logistics, Moussy,
Freddy, Levy, Aghai, and Monline UK played in the African Businesses, as well as the role that
each of Moussy and the English Defendants played in Morsgate, Parker, and Monline UK.
7/19/2023 English Ct. Hr'g Tr. at 31; *see* Proposed Issues at 7-8.  These documents were sought
"for the independent purpose of establishing the relationship of Defendants Levy and Aghai to the
African Businesses, which, in turn, would help Moussy support his allegation that they are
nominees for Freddy Salem."  5/1/2024 Goldring Decl. ¶ 15.  Save for their references to the
"African Business," the disclosure requests under Proposed Issue 9 bear no resemblance to the
requests in the challenged Subpoena, which target financial records reflecting the trading activity

of the African Businesses—not documents reflecting the composition of the African Businesses. Indeed, it would seem doubtful that JPM even possesses documents in the latter category. *See* Opposition at 9.

Freddy appears to interpret the English Court's determination that "the broad issues of the African [B]usiness[es] [are not] a key issue in [the English Proceedings]" as a categorical bar to *any* discovery related to African Businesses. But the English Court made that determination solely in the context of considering Proposed Issue 9—which, once again, concerned Moussy's requests for information on the composition and general operations of the African Businesses. *See* 7/19/2023 English Ct. Hr'g Tr. at 40-41. Far from announcing a blanket prohibition on all discovery related to the African Businesses, the English Court appeared to recognize the relevance of discovery related to the African Businesses' trading activity. For instance, the English Court acknowledged Moussy's need to assess the "benefits that [the English Defendants] have received from the supply of Parker services under the 2016 agreement or otherwise to other companies *within the African business* or from other activities of [Monline UK]" in approving Proposed Issues 8(g) (concerning whether Monline UK supplied the Parker Services or other services to persons other than Morsgate and, if so, under what terms and in what circumstances Monline UK supplied such services) and 8(h) (concerning what payment Monline UK has received since June 7, 2016 from entities other than Morsgate). *Id.* at 25-26 (emphasis added). And the English Court further agreed that "the extent of the business opportunity" lost through the UK Transfer was "relevant" to "quantum" and would require information "about what Parker services were being supplied and to whom." *Id.* at 23. The suggestion that the English Court—in rejecting the specific set of requests under Proposed Issue 9—deemed irrelevant *all* disclosure concerning the African Businesses is, at best, misguided.

Moreover, even setting aside the inapplicability of the English Court's remarks as to Proposed Issue 9, the Court is not convinced that a foreign tribunal's adverse discovery rulings normally should be afforded dispositive or otherwise significant weight in the assessment of whether a Section 1782 applicant has sustained his burden under the "for use" requirement. Such consideration would seem to be in tension with the statute's absence of a "foreign discoverability" requirement. While the Court recognizes that a sweeping and unambiguous pronouncement by the English Court that the specific discovery sought here is wholly irrelevant to the English Proceedings would certainly betray any representation that the requested discovery is "for use" in those proceedings, no such pronouncement was made. Accordingly, the Court discerns no basis from the English Court's rulings on the parties' proposed issues of disclosure to find that Moussy has failed to meet the "for use" requirement here.

Freddy's arguments challenging Moussy's remaining discovery requests also fail. He urges that Moussy's failure to request discovery concerning Transglobe and Glynfield in the English Proceedings demonstrates the broad irrelevance of these entities. Motion. at 7; *see* Michaelson Decl. ¶ 16. But, of course, there is no exhaustion requirement under Section 1782. *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d Cir. 1995) ("Relying on the plain language of the statute, this Court has also refused to engraft a 'quasi-exhaustion requirement' onto section 1782 that would force litigants to seek 'information through the foreign or international tribunal' before requesting discovery from the district court." (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992))). Freddy also argues that those requests concerning Gestcom, Monline UK, and Morsgate (Requests 3, 7, 9, and 10) exceed the scope of discovery already granted in the English Proceedings. Motion at 7. That simply is not a basis to find that the discovery in a Section 1782 application is not "for use" in the foreign proceedings.

The Court thus finds that the statutory requirements under Section 1782 have been met and so turns to the remaining discretionary factors raised in Freddy's motion to quash.

**2.      Whether the Request is an Attempt to Circumvent Foreign Proof-Gathering Restrictions**

Freddy accuses Moussy of attempting to circumvent the English Court's rulings and procedures, once again relying on his misconstruction of the English Court's discovery determinations.  This argument fares no better under this banner.

The third *Intel* factor seeks to curtail "attempt[s] to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  At the same time, however, Section 1782 does not limit a district court's authority to require the production of documents "to materials that could be discovered in the foreign jurisdiction if the materials were located there." *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018) (quoting *Intel*, 542 U.S. at 260).  In fact, the Second Circuit has expressly instructed that a court should not deny "discovery pursuant to § 1782 solely because such discovery is unavailable in the foreign court." *In re Metallgesellschaft*, 121 F.3d at 79.  At first blush, this instruction might seem difficult to reconcile with the instruction under the third *Intel* factor that the court consider whether the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country." *See Mees*, 793 F.3d at 303 n.20.  But the fact "[t]hat a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means." *Id.*  Rather, "[p]roof-gathering restrictions are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Id.* (internal quotation marks omitted).  "[T]o demonstrate circumvention,

[the party opposing the application] must illustrate . . . that [the applicant is] engaged in a bad faith endeavor to misuse Section 1782." *In re Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d at 251.

Because the English Court did not expressly reject the very discovery sought in the instant matter, Freddy's argument fails at the outset. *Cf. In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011) ("Without a definitive determination that the [foreign court] has denied [the applicant] access to the same documents that [the applicant] seeks in its section 1782 discovery application, an issue on which appellants bear the burden of proof as the parties opposing discovery, it cannot be said that [the] section 1782 application is 'an attempt to circumvent foreign proof-gathering restrictions.'"). Even if it had, it is far from clear that such a rejection—especially in the absence of any showing of bad faith, *see infra*—would necessarily evince circumvention. *See id.* (explaining that "regardless of [the foreign court]'s rulings on [the applicant]'s request for documents, it would be a stretch to conclude that the section 1782 proceeding was an attempt to circumvent [foreign] restrictions that somehow was offensive to the [foreign court]" where the foreign court "might be receptive to section 1782 evidence").

Freddy plucks language from three cases in this District to support his general proposition that Section 1782 requests are routinely denied where the applicant has already sought and has been denied the same discovery from the foreign tribunal. *See* Motion at 8-9. But in two of these cases, the court did not even find that the applicant's Section 1782 request concealed an attempt to circumvent the foreign tribunal's rules. *See In re Tel. Media Grp. Ltd.*, No. 23 Misc. 215 (JGLC), 2023 WL 5770115, at *8-9 (S.D.N.Y. Sept. 6, 2023) (holding that the circumvention factor *favored* granting the application where the respondent "presented no indication that any [] rule or policy exists" in the United Kingdom that "bar[s]" the use of the at-issue evidence to

support defenses to defamation or that "Section 1782 assistance would be rejected or otherwise forbidden"); *In re Top Matrix Holdings, Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *6 (S.D.N.Y. Jan. 16, 2020) (holding that the circumvention factor *favored* granting the application where the respondent was "unable to point to any specific Swiss [confidentiality] policy that [the applicant]'s request would circumvent," and the Swiss court had not issued any negative discovery ruling barring use of the requested discovery). And in the third case, the applicant had not sought (and thus had not been denied) the discovery from the foreign tribunal. *See In re Kreke Immobilien KG*, No. 13 Misc. 110 (NRB), 2013 WL 5966916, at *6 (S.D.N.Y. Nov. 8, 2013), *abrogated by In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019).

Regardless, Freddy has failed to illustrate that Moussy is engaging in a bad faith endeavor to misuse Section 1782. In an effort to impugn Moussy's motivations in applying for discovery assistance here, Freddy suggests that Moussy intends to use the discovery outside of the English Proceedings. *See* Dkt. 9 at 2 ("Applicant's course of conduct suggests that his goal is not to obtain legitimate discovery 'for use' in a foreign proceeding, but rather to pry into unrelated (and previously settled) business affairs for other purposes."); Reply at 7-8. But Moussy has denied such intent, and even has offered to enter into a stipulation precluding use of the materials outside of the English Proceedings. *See* 4/16/2024 Conference Tr. at 17:8-18. The Court has no reason to discredit this representation. In any event, "ancillary benefits that may accrue to a Section 1782 petitioner do not weigh against a meritorious application." *In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *11 (finding no bad faith circumvention where the intervenor alleged that the Section 1782 discovery might be used for other purposes); *In re Al-Attabi*, No. 21 Misc. 207 (VSB) (RWL), 2022 WL 229784, at *9 (S.D.N.Y. Jan. 26, 2022) ("[P]rovided the statutory and discretionary criteria are satisfied, as they are here, a Section 1782 application should not be denied merely

26

because the discovery material may have potential other uses by the petitioner."); *cf. In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) (holding that "Section 1782 does not prevent an applicant who lawfully has obtained discovery under the statute with respect to one foreign proceeding from using the discovery elsewhere unless the district court orders otherwise").

Next, Freddy's charge that Moussy has misrepresented the English Court's discovery order rings hollow. As discussed at length *supra*, this Court discerns no express pronouncement from the English Court prohibiting the discovery sought in the instant action.[7]

Finally, Freddy takes issue with the lack of explanation for Moussy's noncompliance with Rule 45. Moussy's counsel already conceded the failure to provide the requisite notice, in violation of Rule 45, and expressed that the failure was "inadvertent." 4/16/2024 Conference Tr. at 8:24-9:1. The lack of further explanation does not demonstrate bad faith, especially considering that Moussy seems to have made every effort to minimize the prejudice arising from his noncompliance with Rule 45. For instance, Moussy shared the entirety of JPM's productions with Freddy shortly after Moussy's Rule 45 noncompliance was brought to light. *See* Dkt. 15 at 3. Additionally, Moussy reportedly engaged in good faith efforts to come to an agreement with Freddy whereby

---

[7] On a related note, Freddy makes much of "international comity" in urging denial of Moussy's application, suggesting that this Court's granting of Moussy's Section 1782 application may offend the English Court. Motion at 9-10. Freddy's concern is misplaced. Once again, the English Court did not deny the discovery sought here. Even if it had, such comity concerns still "do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a)." *Intel*, 542 U.S. at 261. Significantly, Freddy has offered no authoritative proof that the English Court would reject the discovery requested here. *Cf. In re App. of Auto-Guadeloupe Inv. S.A.*, No. 12 Misc. 221 (RPP), 2012 WL 4841945, at *6 (S.D.N.Y. Oct. 10, 2012) ("Second Circuit case law places the burden on the party opposing discovery to show that a foreign court would not be receptive to this assistance."). And interestingly, when Freddy's English counsel raised the issue of Moussy seeking the discovery on the African Businesses through his Section 1782 application pending before in the Southern District of Florida, *see In re Moussy Salem*, No. 23 Civ. 23186 (KMM) (S.D. Fla.), the English Court expressed no disapproval as to Moussy's making such request and insisted that Freddy's English counsel allow the United States court to resolve any issues arising in that Section 1782 action. *See* 7/19/2023 English Ct. Hr'g Tr. at 37-38.

Moussy would distill the information from the document production to stipulations corroborating admissions made by the defendants in the English Proceedings and would destroy the documents thereafter. *Id.* at 2-4. And lastly, Moussy represented to this Court that he does not intend to use the discovery sought outside of the English Proceeding and proposed a stipulation to that effect (as well as a stipulation barring Moussy from serving JPM with any further document requests). 4/16/2024 Conference Tr. at 17:8-18.

In these circumstances, the Court finds no basis to infer that Moussy made his Section 1782 application to circumvent proof-gathering restrictions in the English Court. Accordingly, the Court finds that the third *Intel* factor weighs in favor of Moussy.

### 3.    Whether the Request is Unduly Intrusive or Burdensome

Finally, Freddy urges that fourth *Intel* factor also weighs against granting the Section 1782 application. Under the fourth *Intel* factor, "a district court evaluating a [Section] 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure," *Mees*, 793 F.3d at 302, which includes consideration of the probative value of the materials sought, *In re Okean B.V. & Logistic Solution Int'l*, 60 F. Supp. 3d 419, 432 (S.D.N.Y. 2014) (denying a Section 1782 application where production of the materials would be intrusive and burdensome and the "probative value . . . [was] conjectural at best"). The determination of whether a subpoena creates an undue burden further "depends upon such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (internal quotation marks omitted). Of course, as Freddy is not being asked to produce anything, he cannot advance arguments as to the

burden the Subpoena imposes. *In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *11. Nevertheless, Freddy has "standing to object to the subpoena as overbroad." *Id.*

In so objecting to the Subpoena's breadth, Freddy merely asserts that "nearly all" the financial records included in the document request "are irrelevant to the English Case" and that those financial records that are concededly relevant "are excessive." Motion at 10. As support for these broad averments, Freddy relies exclusively on his interpretation of the English Court's relevancy determinations. *Id.* Setting aside that "whether a request is intrusive or burdensome should not be assessed based on the 'discovery scope' available in the foreign proceedings," *Mees*, 793 F.3d at 302, the Court has already rejected Freddy's interpretation of the English Court's discovery rulings. Accordingly, the Court finds that this factor also weighs in Moussy's favor.

\* \* \*

Having considered Moussy's Section 1782 application with fresh eyes and in conjunction with Freddy's arguments, the Court finds once again that the application meets all the statutory requirements and that every discretionary *Intel* factor weighs in favor of granting it. The Court thus finds no basis on the merits of the application to quash the Subpoena and turns next to consider the appropriate remedy for Moussy's noncompliance with Federal Rule of Civil Procedure 45.

**B.    Appropriate Remedy for Noncompliance with Federal Rule of Civil Procedure 45**

As earlier discussed, Moussy failed to comply with his obligations under Rule 45 to provide notice to the English Defendants before serving his Section 1782 subpoena *duces tecum* on JPM. While this Court certainly has the discretion to quash the Subpoena in light of Moussy's noncompliance, there is no requirement that it do so. *In re Hornbeam*, 2015 WL 13647606, at *8. Moreover, "courts often require the party seeking such relief to show that it was prejudiced by the lack of notice before quashing a subpoena for failure to provide notice." *Id.* (collecting cases).

Here, as a result of Moussy's noncompliance, Freddy was undoubtedly deprived of his opportunity to challenge the appropriateness of Moussy's *ex parte* application and representations therein.  The Court thus granted Freddy leave to intervene and has fully heard Freddy on his arguments attacking Moussy's Section 1782 application.  Moreover, Moussy has already shared JPM's production with Freddy.  Freddy also argues that he has been prejudiced because Moussy's failure to comply with Rule 45 "deprived Freddy of the benefit of the English Court's ruling in his favor," Motion at 12, but again, this Court does not interpret the English Court's rulings as rejecting the discovery sought in the Subpoena.  Given that Freddy has articulated no further prejudice arising from Moussy's noncompliance, the Court finds that the drastic measure of quashing the Subpoena is unwarranted here.  Instead, the Court finds that the appropriate remedy is to bind Moussy to the terms he proposed at the April 16, 2024 conference.

Accordingly, within two weeks of this Opinion and Order, the parties shall propose language, preferably in a joint proposal, for a protective order that prohibits Moussy (1) from seeking additional documents from JPM under the instant Subpoena and (2) from using the documents produced by JPM in response to the Subpoena in any other proceedings.

## V.  Conclusion

For the foregoing reasons, the Court denies Intervenor Freddy Salem's motion to quash. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 19.

SO ORDERED.

Dated: June 17, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge